Starkey, Kelly, Bauer,                              Moye, O'Brien, O'Rourke, Pickert,
 Kenneally & Cunningham                              & Martin, LLP
Kevin N. Starkey, Esq. (KS 4872)                   Gregory S. Martin, Esq.
1593 Route 88 West                                 800 S. Orlando Ave
Brick, New Jersey 08724                            Maitland, Florida 32751
732-840-5900                                       407-622-5250
Attorneys for Plaintiff                            Attorneys for Plaintiff
AMEC Civil, LLC                                    AMEC Civil, LLC

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

AMEC CIVIL, LLC,
 a Delaware limited liability company,

                                              CIVIL ACTION No. 06-64

    Plaintiff,

v.

DMJM HARRIS, INC.,
 a New York corporation

    Defendant.
-------------------------------------------------------

DMJM HARRIS, INC.,
 a New York corporation

    Third Party Plaintiff,

v.

HARDESTY & HANOVER, LLP,

    Third Party Defendant.

_____/

## AMEC'S MEMORANDUM OF LAW IN RESPONSE TO DMJM'S MOTION FOR SUMMARY JUDGMENT BASED ON TOTAL COST METHOD OF DAMAGES AND CUMULATIVE IMPACT THEORY

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................1

STATEMENT OF DISPUTED FACTS ....................................................3

  I.  AMEC's Claim ..............................................................................4

  II.  DMJM's Criticism of AMEC's Claim .........................................8

    A. Claim vs. Project Overruns ........................................................8

    B. Use of Blue Book Rates ...............................................................9

    C. DMJM's Drinking Water Example...........................................10

LEGAL STANDARD..............................................................................11

LEGAL ARGUMENT ........................................................................... 13

  I.  AMEC Does Not Have A Total Cost or Modified Total Cost Claim; DMJM's Case Law Is Inapplicable Here ................................... 13

    A. Construction Damages Calculation, Generally.......................... 13

    B. The Total Cost Method & Modified Total Cost Method, Defined........... 14

    C. AMEC Has an Actual Cost Claim that is Itemized, Segregated and Supported by Project Documentation ......................................... 17

    D. DMJM's Cited Cases Are Inapplicable, Even on DMJM's Assertion of Facts ................................................................... 18

    E. Total Cost Claims Are Not Per Se Barred as a Matter of Law................. 21

  II.  AMEC Does Not Rely on a "Cumulative Impact" Claim as Asserted by DMJM; Nor Are Cumulative Impact Claims "Wholly Rejected" As a Matter of Law ....................................................... 22

A.  Cumulative Impact Claims, Defined ........................................................... 22

B.  AMEC Does Not Have a Separate Claim for Indirect Cumulative Impacts Reasoned on a Mysterious "Greater-Than-The-Sum-Of-Its-Parts" Theory as DMJM Asserts ....................................................................................... 23

C.  The Cumulative Impact Theory is Well-Recognized by the Courts .......... 25

III.  DMJM's Assertion that Causation Cannot be Established under the Total Cost Method and Cumulative Impact Theory is Clearly Wrong; AMEC Will Establish Causation at Trial ........................................................................... 29

IV.  There is No Legal Requirement that Specific Damages Must be Tied to Specific Breaches; Reasonable Certainty is the Standard ............................ 35

CONCLUSION ...................................................................................................... 37

# <u>TABLE OF AUTHORITIES</u>

## Cases

<u>Allstate Ins. Co. v. Brown</u>, 834 F.Supp. 854 (E.D.Pa.1993) ................................... 12

<u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074 (3d Cir. 1996) ..................... 12

<u>Amelco Elec. v. City of Thousand Oaks</u>, 27 Cal. 4th 228 (2002) ........................... 21

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505,
    91 L.Ed.2d 202 (1986) ......................................................................................... 12

<u>Atlas Constr Co., Inc.</u>, 90-2 BCA ¶ 22,812, 1990 WL 27623
    (G.S.B.C.A. 1990) ........................................................................................ 28, 33

<u>Beaty Elec. Co., Inc.</u>, 90-2 BCA ¶ 22829, EBCA No. 408-3-88,
    1990 WL 32047 (1990) ......................................................................................... 24

<u>Betchel Nat'l, Inc.</u>, 90-1 BCA ¶ 22549, NASA BCA No. 1186-7,
    1989 WL 160470 (N.A.S.A.B.C.A. 1989) ...................................................... 23, 28

<u>Biemann & Rowell v. Donohoe Co., Inc.</u>, 556 S.E.2d 1 (N.C. Ct. App. 2001) ..... 16

<u>Boyajian v. United States</u>, 23 F.2d 1231, 191 Ct.Cl. 233 (1970) ........................... 31

<u>Cavalier Clothes, Inc. v. U.S.</u>, 51 Fed. Cl. 399 (2001) .................. 13, 14, 15, 16, 19

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S.Ct. 2548 (1986) ............................ 12

<u>Centex Bateson Constr. Co.</u>, 99-1 BCA ¶ 30153, VABCA No. 4613,
    1998 WL 853085 (Dec. 3, 1998) .................................................................. 28, 33

<u>Charles G. Williams Constr. Inc.</u>, 89-2 BCA ¶ 21733, ASBCA No. 33766,
    1989 WL 32981 ............................................................................................ 28, 33

<u>Clearwater Assocs. v. Hicks Laundry Equip. Corp.</u>, 433 So.2d 7
    (Fla.App.2.Dist., 1983) ......................................................................................... 37

David J. Tierney, Jr., Inc., 88-2 B.C.A. (CCH) ¶ 20,806, 1988 GSBCA
    LEXIS 151 (1988)................................................................... 26, 27

Hensel Phelps Constr. Co. v. General Services Admin., 01-1 BCA ¶ 31249,
    2001 WL 43961 (G.S.B.C.A. 2001) ............................................ 28, 33

Huber, Hunt & Nichols, Inc. v. Moore, 67 Cal.App.3d 278,
    136 Cal.Rptr. 603 (1977) .................................................. 30, 31, 32

In re Venetian Lien Litig., 2004 WL 3265025 (Nev. Dist. Ct., 2004) ............ 25, 32

Ingalls Shipbuilding Div., Litton Systems, Inc., 78-1 BCA P 13038,
    ASBCA No. 17579, 1978 WL 2301 (A.S.B.C.A. 1978)..................................... 26

J.D. Hedin Const. Co. v. U.S., 171 Ct. Cl. 70 (1965)............................................ 21

Lang v. New York Life Ins. Co., 721 F.2d 118 (3d Cir. 1983) .............................. 11

Marzano v. Computer Sci. Corp. Inc., 91 F.3d 497 (3d Cir. 1996)........................ 12

Metro. Atlanta Rapid Trans. Auth. v. Green Intern, Inc.,
    235 Ga. App. 419 (1998) ............................................................. 21, 36

Neal and Co., Inc. v. U.S., 945 F.2d 385 (Fed. Cir. 1991) ..................................... 37

North Star Alaska Housing Corp. v. U.S., 76 Fed.Cl. 158 (2007) ............. 13, 16, 19

Pittman Constr. Co., 81-1 BCA ¶ 14847, GSBCA No. 4897,
    GSBCA No. 4923 (1980).............................................................. 23, 35

Point Productions A.G. v. Sony Music Entertainment, Inc., 215 F.Supp.2d 336
    (S.D.N.Y. 2002)..................................................................................... 33

Propellex Corp. v. Brownlee, 342 F.3d 1335 (Fed.Cir. 2003) ............................... 13

Saudi Tarmac. Co. Ltd., 89-3 BCA ¶ 22132, ENG BCA No. 484,
    1989 WL 98743 ............................................................................. 28, 33

Servidone Const. Corp. v. U.S., 931 F.2d 860 (Fed. Cir. 1991)............................. 19

State v. Guy F. Atkinson Co., 187 Cal.App.3d 25,
231 Cal.Rptr. 382 (1986) ................................................................. 28, 33

Wunderlich Contracting Co. v. United States, 173 Ct.Cl. 180,
351 F.2d 956 (1965).......................................................................... 15

Youngsdale & Sons Constr. Co. v. U.S., 27 Fed.Cl. 516 (1993) .......................... 19

## Other Authorities

BRUNER & O'CONNOR CONSTR. LAW § 19:70 ....................................... 36

BRUNER & O'CONNOR CONSTR. LAW §19:94 ....................................... 21

McCormick, HANDBOOK ON THE LAW OF DAMAGES, § 73, at 261 (1935) ............. 33

Michael R. Finke, *Claims for Construction Productivity Losses*, 26 Pub.
Cont. L.J. 311, 337-338 (Spring 1997) ................................................ 34

## Rules

Fed.R.Civ.P. 56(c)..................................................................... 11

## PRELIMINARY STATEMENT

AMEC's claim is not, as DMJM would have this Court believe, calculated on a total cost basis or a modified total cost basis.  Furthermore, even if AMEC's claim was calculated on a total or modified total cost basis, AMEC's claim would not be barred as a matter of law.  Courts routinely recognize the validity of the total cost method and modified total cost method.  Moreover, AMEC does not rely upon alleged cumulative impact theories to prove causation.  Thus, while a part of AMEC's damages do reflect the multitudinous effect of the various design errors and omissions, it is incorrect to state that AMEC will be unable to show causation.

AMEC's claim in this action is calculated through the use of recognized and widely accepted construction cost accounting methods.  AMEC has retained a certified public accountant with extensive experience in calculating construction claims to determine the extent of AMEC's damages in this action.

Notably, DMJM presents its motion in an effort to avoid a trial where a jury will hear repeatedly of DMJM's shortcomings and its woefully lacking design on this Project.  DMJM's design was so poor that in 2002, the New Jersey Department of Transportation determined that DMJM would have to completely re-design the remaining portions of the Project in order to achieve a constructible design.

Many of the issues which DMJM raises in the instant motion are factual issues which should be left to be determined by the trier of fact.  DMJM speculates

that AMEC cannot prove the elements necessary to pursue a total cost or modified total cost claim.  DMJM further speculates that AMEC relies on the cumulative impact theory to prove causation.  By filing this Motion DMJM attempts to foreclose AMEC from presenting its proofs at trial.  Even if AMEC's claim were a total cost or modified total cost claim, AMEC would be able to show at trial that the use of those theories is appropriate.

DMJM also furthers a legal argument which is incongruent with its own purportedly undisputed facts.  While DMJM's entire legal argument is predicated upon the fact that courts frown upon the use of total cost method in calculating damages, its undisputed facts and affidavits do not demonstrate that AMEC has a total cost claim.  Moreover, DMJM provides this Court with weak case law and quotes *ad nauseum* the text of a journal for its position that damages calculated pursuant to a cumulative impact theory are somehow improper.  However, in its statement of facts and affidavits, DMJM fails entirely to support its proposition that AMEC is pursuing a cumulative impact claim improperly.

AMEC's claim is a discrete quantification of the costs that AMEC incurred on this Project as a result of DMJM's negligence.  In order to determine and prove the extent of AMEC's damages, AMEC has retained three expert witnesses; a delay expert, design expert and damages expert.  Through these three experts, as well as fact witnesses, AMEC will show: (1) that DMJM was negligent in carrying

out its duties as the designer for the Shark River Bridge Project, (2) that as a result of DMJM's negligent performance, AMEC experienced delays and disruptions to its work, and (3) the amount of damages AMEC incurred as a result of the delays and disruptions attributable to DMJM.  In addition to its expert witnesses, AMEC intends to present at trial fact witnesses that will testify that the monetary damages which AMEC seeks in this action were suffered as a direct result of DMJM's negligence.

Accordingly, given that DMJM has failed to demonstrate the absence of genuine issues of material fact in dispute and that it has misapplied relevant case law, DMJM's Motion for Summary Judgment should be denied.

## STATEMENT OF DISPUTED FACTS

In January 2006, AMEC Civil, LLC ("AMEC") filed the instant action against DMJM to recover the damages it suffered due to DMJM's deficient design. *See* Affidavit of Grant R. Ralston in Opposition to DMJM's Motion for Summary Judgment ("Ralston Affidavit"), ¶ 24.  DMJM's design was so poor that during construction, the New Jersey Department of Transportation (the "Department") called for a complete re-design of the Route 35 Shark River Bridge Replacement Project ("Project").  *See* Certification of Gregory S. Martin in Opposition to DMJM's Motion for Summary Judgment, ¶ 5.  As a result of DMJM's deficient design, AMEC incurred significant delays on the Project and increased costs of

construction.  *See* Affidavit of Ted NeSmith in Opposition to DMJM's Motion for Summary Judgment ("NeSmith Affidavit"), ¶ 11; *See also*, Affidavit of Kenneth J. O'Connell in Opposition to DMJM's Motion for Summary Judgment ("O'Connell Affidavit"), ¶ 11.  In fact, AMEC has been damaged in excess of $52 million dollars because of DMJM's negligence.  Id.

## I.     AMEC's Claim

AMEC intends to present its damages at trial through its damages expert Ted NeSmith, among others.  *See* Ralston Affidavit, ¶ 40.  Mr. NeSmith is a Certified Public Accountant and Certified Valuation Expert.  *See* NeSmith Affidavit, ¶ 4. His company, Quantum Consulting Group, LLC ("Quantum") specializes in forensic accounting and business valuations.  *See* NeSmith Affidavit, ¶ 4.  Mr. NeSmith has extensive experience in valuing and evaluating construction contract claims.  *See* NeSmith Affidavit, ¶ 5.  AMEC's damages claim was created using recognized construction cost accounting principles and is not the subject of "highly dubious accounting practices."  *See* NeSmith Affidavit, ¶ 10.

Contrary to DMJM's assertions, the damages which AMEC claims in this action are not calculated on a total cost basis or a modified total cost basis.  *See* NeSmith Affidavit, ¶ 12.  The calculation of damages pursuant to the total cost method is accomplished by taking the difference between the total costs incurred in performance of a contract and the bid price or budgeted costs, plus a markup. *See*

NeSmith Affidavit, ¶ 13.   With a modified total cost method, damages are calculated as the difference between total costs incurred in performance of a contract and the bid price, adjusted for any deficiencies in the use of the total cost method.  *See* NeSmith Affidavit, ¶ 14.  AMEC has employed neither method in calculating the damages for which DMJM is responsible. *See* NeSmith Affidavit, ¶ 12.

AMEC's damages are calculated in a discrete manner in order to claim only those damages which are resulting from DMJM's negligence.   *See* NeSmith Affidavit, ¶¶ 21-40.  For example, AMEC's claim for extended field overhead was computed by calculating a daily rate for the field overhead on the Project.  *See* NeSmith Affidavit, ¶ 23.  AMEC then multiplied that daily rate by 943, the number of days of delay which AMEC's scheduling expert, Ken O'Connell determined were attributable to DMJM's negligent performance of its obligations on the Project.[1]   *See* NeSmith Affidavit, ¶ 23.   Only those days of delay that are attributable to DMJM's negligence are used to compute AMEC's extended overhead claim.  *See* NeSmith Affidavit, ¶ 23; O'Connell Affidavit, ¶ 11.

---

[1] Notably, AMEC experience more than 943 days of delay on the Project. However, it accelerated construction, thereby significantly mitigating the number of days of delay actually encountered.  *See* O'Connell Affidavit, ¶ 18.

Similarly, AMEC's claim for labor inefficiency and lost productivity was computed by selecting specific cost codes[2] from AMEC's job cost report that were affected by DMJM's negligence.  *See* NeSmith Affidavit, ¶ 33.  After careful consideration, AMEC's management determined what cost codes were affected by DMJM's negligence and only those codes were included as part of AMEC's claim here.  *See* NeSmith Affidavit, ¶ 37; Ralston Affidavit, ¶¶ 42-43.

While AMEC compares budgeted and actual costs in computing its labor inefficiency and lost productivity claim, this comparison between budgeted and actual costs does not make AMEC's claim a total cost or modified total cost claim. *See* NeSmith Affidavit, ¶ 34.  Rather, it is a discrete evaluation of each of the issues which arose and for which DMJM is responsible and linking them to the specific cost overruns AMEC experienced.  *See* NeSmith Affidavit, ¶ 37.  Through an extensive process of meetings and conferences, throughout the span of several months, Quantum along with AMEC's management, identified the discrete cost codes which were impacted by DMJM's negligence and used only those codes in calculating its Labor Inefficiency/Lost Productivity claim.  *See* NeSmith Affidavit, ¶ 37; Ralston Affidavit, ¶¶ 42-43.

Even if AMEC's claim were a total cost claim or a modified total cost claim, AMEC could prove the elements necessary to present such a claim and recover its

_____

[2] AMEC maintained a cost accounting system to carefully track the costs expended in constructing the Project.  *See* Ralston Affidavit, ¶ 17.

damages against DMJM.  *See* NeSmith Affidavit, ¶ 9; Ralston Affidavit, ¶¶ 42-43 & 56.  AMEC's project management will testify at trial that based upon their extensive experience bidding construction projects, AMEC's bid was reasonable. *See* Ralston Affidavit, ¶ 56.  Moreover, AMEC's project management will testify that based upon their extensive experience managing construction projects, AMEC's costs on this Project were reasonable.  *See* Ralston Affidavit, ¶ 56.  Mr. NeSmith will attest that AMEC's costs on this Project were reasonably recorded and reasonably accurate.  *See* NeSmith Affidavit, ¶ 9.  Finally, AMEC's project management will testify that the additional costs which it seeks as damages in this action were not to AMEC's account.  *See* Ralston Affidavit, ¶ 56.  In fact, AMEC's project management will testify that the costs it seeks in this matter have been discretely identified as those which are attributable to DMJM's negligence.  *See* Ralston Affidavit, ¶¶ 42-43.

For example, AMEC's expert O. Charles Guedelhoefer has determined that DMJM was negligent in providing Bulkhead No. 1 design dimensions after the contractually designated sheet pile could not be acquired.  *See* Affidavit of Otto Charles Guedelhoefer in Opposition to DMJM's Motion for Summary Judgment ("Guedelhoefer Affidavit"), ¶¶ 10-16.  Kenneth J. O'Connell determined that DMJM's failure to provide the necessary dimensioning delayed the critical path of construction for the Project.  *See* O'Connell Affidavit, ¶ 16.  AMEC's project

7

management has identified the cost codes that were affected as a result of DMJM's negligence.  *See* Ralston Affidavit, ¶¶ 42-43.  Ted NeSmith has quantified those discrete costs as well as the delay damages.  *See generally*, NeSmith Affidavit.  Through AMEC's three expert witnesses and its Project management AMEC will prove that the damages it seeks in this action were caused by DMJM's negligence.

Similarly, Mr. Guedelhoefer has determined that DMJM was negligent in its initial design and subsequent re-designs of the north roadway approach area.  *See* Guedelhoefer Affidavit, ¶¶ 17-27.  Dr. O'Connell's expert analysis reveals that as a result of DMJM's failings, AMEC was delayed.  *See* O'Connell Affidavit, ¶ 16.  AMEC project management will testify that it selected those cost codes affected by DMJM's negligent design of the north roadway for inclusion in its claim. *See* Ralston Affidavit, ¶¶ 42-43.  Ted NeSmith quantified the extent of the monetary damage.  *See generally*, NeSmith Affidavit.

## II.    DMJM's Criticism of AMEC's Claim[3]

### A.    *Claim vs. Project Overruns*

DMJM repeatedly takes issue with the quantum of AMEC's damages as being significantly larger than the cost overruns AMEC encountered on the Project.   DMJM simplistically attempts to persuade this Court that because

---

[3]  AMEC specifically addresses the remainder of DMJM's criticisms in its Response to DMJM's Statement of Undisputed Facts.

AMEC's claim of $52 million dollars is larger than the cost overruns shown on AMEC's job cost report, AMEC's claim is overstated by $27 million.  However, DMJM fails to make an "apples to apples" comparison.  *See* NeSmith Affidavit, ¶¶ 48-54.

In fact, AMEC's total monetary entitlement contains categories of damages which would not be reflected on a job cost report.  *See* NeSmith Affidavit, ¶ 50. Such damages include home office overhead, interest, attorneys fees in the underlying state court litigation, bond premiums, return of liquidated damages and complete costs of owned equipment.  *See* NeSmith Affidavit, ¶ 50.  In fact, upon reconciling AMEC's damage claim to account for those items which are not found in the job cost report, it is clear that AMEC's claim is for $1.2 million dollars *less* than the loss reflected on its job cost report.  *See* NeSmith Affidavit, ¶¶ 52-53.

B.     *Use of Blue Book Rates*

AMEC's use of Rental Rate Blue Book ("Blue Book") rates to quantify its owned equipment claim is appropriate.  *See* NeSmith Affidavit, ¶ 29.  AMEC's claim for extended equipment costs was calculated using industry recognized Blue Book rates.  *See* NeSmith Affidavit, ¶ 24.  Contrary to DMJM's assertions, the use of Blue Book rates does not make AMEC's claim the subject of "highly dubious accounting methods."   *See* NeSmith Affidavit, ¶ 25.  The use of Blue Book rates to determine reimbursement rates for owned heavy equipment use is an industry

9

standard which is commonly employed.  *See* NeSmith Affidavit, ¶ 26.  Blue Book rates are specified by 47 state department of transportations, including the New Jersey Department of Transportation, and are the industry guide for determining reimbursement rates for heavy equipment use.  *See* NeSmith Affidavit, ¶ 27.

In this case, the use of Blue Book rates is especially appropriate because the job cost report does not track or capture the extended equipment ownership costs for the Project.  *See* NeSmith Affidavit, ¶ 29.  Blue Book rates reflect depreciation, cost of money, indirect costs and major repairs.  *See* NeSmith Affidavit, ¶ 30.  The primary ownership cost for owned equipment charged to the job cost report on this Project was straight-line depreciation.  *See* NeSmith Affidavit, ¶ 31.  Moreover, the depreciation was only charged for the period of time that the equipment was originally scheduled to be on the Project, not the period of time the equipment was actually on the Project.  *See* NeSmith Affidavit, ¶ 31.  This amounts to a difference of approximately 32 months.  *See* NeSmith Affidavit, ¶ 31.  Accordingly, because the job cost report for this Project does not capture all of the extended equipment ownership costs, the appropriate method for calculating same is through the use of the Blue Book Rates.  *See* NeSmith Affidavit, ¶ 32.

C.    *DMJM's Drinking Water Example*

The drinking water example to which DMJM repeatedly refers unquestionably demonstrates that AMEC's claim is not calculated on a total cost

basis.  DMJM is critical of the portion of AMEC's claim which seeks recovery of approximately half the cost of drinking water for the Project.  AMEC expended $7,549 for drinking water against a budget of $12,750.  *See* NeSmith Affidavit, ¶ 42.  DMJM is critical of AMEC for claiming the extended drinking water costs even though it did not expend monies over that which it budgeted for drinking water.  However, but for the delays for which DMJM is responsible, AMEC would not have incurred as much for the drinking water as it actually expended.  *See* NeSmith Affidavit, ¶ 44.  Thus, AMEC's daily rate calculation considers the costs AMEC incurred for being on the site longer.  *See* NeSmith Affidavit, ¶ 44.  The budget is irrelevant to that analysis.  *See* NeSmith Affidavit, ¶ 44.  Perhaps more importantly, DMJM's example substantiates that AMEC does not have a total cost (or even a modified cost) claim.  *See* NeSmith Affidavit, ¶ 43.

## **LEGAL STANDARD**

"Summary judgment may only be granted if, upon a review of the materials properly before the court, and viewing the evidence thus considered in a light most favorable to the non-moving party, the court is convinced that no genuine issue of material fact remains for trial and that the movant is entitled to judgment as a matter of law."  Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir. 1983); *See* Fed.R.Civ.P. 56(c).  Summary judgment is only appropriate if the evidence cannot reasonably support a verdict for the non-moving party.  Allstate Ins. Co. v.

Brown, 834 F.Supp. 854, 856 (E.D.Pa.1993). In making its determination on a motion for summary judgment, the district court should view the facts in a light most favorable to the non-moving party and draw all inferences in that party's favor. Marzano v. Computer Sci. Corp. Inc., 91 F.3d 497 (3d Cir. 1996); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If there is *any* evidence in the record from any source from which a reasonable inference in favor of the party opposing the summary judgment motion may be drawn, the moving party simply cannot obtain summary judgment. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 (3d Cir. 1996).

Premature motions can be adequately dealt with under Rule 56(f), which allows a summary judgment motion to be denied if the non-moving party has not had an opportunity to make full discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986). Notably, discovery is not yet complete in this matter. Therefore, although DMJM's Motion fails on the merits, it also fails as a matter of procedure, as it has been filed prematurely. DMJM itself acknowledges the premature filing of its own Motion, yet apparently chose to submit it to the Court anyway, as it seeks to reserve the right to re-file if its current Motion is denied, as it should be. *See* DMJM Memo, p. 39, n. 6.

## <u>LEGAL ARGUMENT</u>

**I.     AMEC Does Not Have A Total Cost or Modified Total Cost Claim; DMJM's Case Law Is Inapplicable Here**

    *A.     Construction Damages Calculation, Generally*

Where liability exists, damage awards generally are calculated based upon the difference between the reasonable cost for performing the work, as changed, and the reasonable cost for performing the work according to the original contract specifications.  <u>Cavalier Clothes, Inc. v. U.S.</u>, 51 Fed. Cl. 399, 417 (2001).  The burden of proof lies on the plaintiff, and such proof must be made with sufficient certainty so that the damages determination will be more than mere speculation.  <u>Id</u>.    Thus, the preferred method for proving such damages is through the submission of actual cost data.  <u>Id</u>.

> The *preferred way* for a contractor to prove increased costs is to submit actual cost data because such data provides the court, or contracting officer, with documented underlying expenses, ensuring that the final amount of the equitable adjustment will be just that – equitable – and not a windfall for either the government or the contractor.

<u>North Star Alaska Housing Corp. v. U.S.</u>, 76 Fed.Cl. 158, 213 (2007) (*citing* <u>Propellex Corp. v. Brownlee</u>, 342 F.3d 1335, 1338-39 (Fed.Cir. 2003)) (internal quotations omitted).  The most logical way to prove damages using the actual cost method is to provide the court with specific documentation that reflects the

expenses caused by government changes to the contract.  <u>Cavalier Clothes</u>, 51 Fed. Cl. at 417.

Following this standard, AMEC has calculated its damages based upon actual costs incurred.  *See generally,* NeSmith Affidavit.  AMEC's extended field and home office overhead are based upon actual costs resulting from the delays. These costs are captured through the determination of a daily rate for each day of delay multiplied by the number of days of delay.  The claim for recovery of liquidated damages is based upon the actual liquidated damages NJDOT assessed against AMEC for being late on the Project as a result of delays for which DMJM is responsible.  AMEC's extended equipment costs are similarly calculated either based upon actual invoices or through the use of the Blue Book which is the industry standard for estimating these types of costs.  AMEC's lost productivity costs are based upon the actual labor costs AMEC incurred.  AMEC's acceleration claim is based upon actual premium time incurred as well as additional temporary material costs incurred to accelerate the project.  The remaining elements of damage represent interest and attorney's fees (as special damages).  Thus, contrary to DMJM's assertion, AMEC has not improperly calculated its damages.

    B.    *The Total Cost Method & Modified Total Cost Method, Defined*

DMJM spends much time in its Memorandum attempting to discredit the total cost method, though it never properly defines the method or explains how

AMEC has relied on it.  Because all construction damages are generally defined as the difference between the actual costs of the changed work and the original reasonable cost, as explained above, it is necessary at some point for all damaged contractors to, in some form, deduct the original estimated cost from the actual costs incurred to determine the quantum of damages.  In essence, the "total cost method" over-simplifies this principle.  The total cost method is used when liability clearly exists, but documentation does not exist to itemize or apportion specific categories of damages, or when the exact computation of damages may prove extremely difficult.

> **[I]n some complex contract cases, exact computation of damages may prove extremely difficult**.  Thus,…the ascertainment of damages, or of an equitable adjustment, is not an exact science, and **where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation**.

Cavalier Clothes, 51 Fed. Cl. at 417 (citations omitted) (emphasis added); *see also* Wunderlich Contracting Co. v. United States, 173 Ct.Cl. 180, 351 F.2d 956, 968 (1965) ("It is sufficient if…[the plaintiff] furnishes the court with a reasonable basis for computation, even though the result is only approximate.").  The total cost method is an "alternative method[] used to determine the quantum of damages for equitable adjustments **if actual costs cannot be documented**."  Cavalier Clothes, 51 Fed. Cl. at 417 (emphasis added).

Under such situations, contractors are allowed to make a reasonable estimation and "pursue damage methods in which their total costs in performing a contract are compared to the reasonable cost of performing the same service." North Star Alaska, 76 Fed.Cl. at 213.  Under the total cost method a "contractor seeks **the difference between its total costs incurred in performance of the contract and its bid price**." Biemann & Rowell v. Donohoe Co., Inc., 556 S.E.2d 1, 5 (N.C. Ct. App. 2001).  Thus, the total cost method has been recognized by federal courts as a viable method of computing damages, when necessary, even though it requires an assumption, or evidence to demonstrate, that the plaintiff is not responsible for any increases in cost.  Cavalier Clothes, 51 Fed. Cl. at 418.

Such fears do not hold true for a "modified total cost claim."  In order to alleviate the stigma associated with the total cost method, the *modified* total cost method takes into account the contractor's contribution of fault.  The modified total cost method is a variant of the total cost method and "is used where the court finds it necessary to adjust either the original contract price or the total cost of performance, or both."  Cavalier Clothes, 51 Fed. Cl. at 418.  The modified total cost method is equivalent to "the total cost method adjusted for any deficiencies in the contractor's proof in satisfying the requirements of the total cost method." North Star Alaska, 76 Fed.Cl. at 213.

Accordingly, while case law exists that both approves of and criticizes the total cost method, in some instances courts use the total cost method or modified total cost method as a reasonable approximation of damages where liability is clear, but documentation of actual costs is not available to itemize or specifically apportion certain categories of damages.  However, for the purposes of <u>this case</u>, weighing the merits of these two damages theories is unnecessary, as explained in detail in the following section, as AMEC's claim is not a total cost or modified total cost claim.

    C.    *AMEC Has an Actual Cost Claim that is Itemized, Segregated and Supported by Project Documentation*

AMEC's damages are calculated in a discrete manner in order to claim only those damages resulting from DMJM's negligence, as detailed in the Statement of Facts above.  For example, AMEC's claim for extended field overhead was computed by calculating a daily rate for the field overhead on the Project, from AMEC's actual costs, and multiplying that daily rate by 943, the number of days of delay which AMEC's scheduling expert, Ken O'Connell, determined were attributable to DMJM's negligent performance of its obligations on the Project. *See* O'Connell Affidavit, ¶ 11.

Similarly, AMEC's claim for labor inefficiency and lost productivity was computed using actual costs.  AMEC's project management selected specific cost codes from AMEC's job cost report that were affected by DMJM's negligence.

Only those codes were included as part of AMEC's claim here.  AMEC did not take its entire job cost report compared to budget and submit the delta as its claim here. *See* NeSmith Affidavit, ¶¶ 33-39.

While AMEC compares budgeted and actual costs in portions of its claim, this comparison between budgeted and actual costs does not make AMEC's claim a total cost or modified total cost claim.  This comparison of budgeted to actual costs has a place in nearly all construction claims.

A litany of project documentation supports AMEC's claims.  Furthermore, contrary to DMJM's contentions, AMEC tracked specific cost codes throughout the entire Project.  *See* Ralston Testimony, Zetlin Certification, Exhibit 3.  *See also,* Ralston Affidavit, ¶¶ 17-18.  While DMJM claims that AMEC completely stopped tracking costs, Mr. Ralston only testified that at some point tracking the lowest level minutia became overly burdensome.  *See* Ralston Testimony, Zetlin Certification, Exhibit 3.  Contrary to DMJM's position, there is no legal requirement that AMEC track every cost at a "microscopic" level.

### D.   *DMJM's Cited Cases Are Inapplicable, Even on DMJM's Assertion of Facts*

Assuming for a moment that DMJM has cited to valid law regarding the total cost method, by its own allegations those decisions, as a whole, do not apply to AMEC's claims.  DMJM quotes and cites to numerous cases that provide warnings, requirements and other insights appropriate only for *total cost claims*.

*See* DMJM Memo, pp. 13-15.  However, DMJM is not even asserting that AMEC utilized a pure total cost method.  Instead, DMJM and its expert only allege that AMEC used the *modified total cost method*, and even then only applied it to a *portion* of its claim.  *See* DMJM Memo, p. 16; Casey Affidavit, p. 4.  Although DMJM is incorrect, as AMEC did not utilize either method, assuming *arguendo* that DMJM is correct in that AMEC used the modified total cost method, DMJM does not distinguish between the two methods in the law that it cites.  Put simply, DMJM never explains why the negative language it has dug up to describe the total cost method should apply to, according to its own allegations, a modified total cost theory applied only to a portion of claim.

For example, DMJM states that courts "frown upon use of the total cost method because it fails to take into consideration costs attributed to the complaining contractor or its subcontractors."  *See* DMJM Memo, p. 14.  However, as discussed above, such fears do <u>not</u> hold true for a modified total cost claim because it takes into account contribution of fault, deficiencies in proof, and allows adjustments to the total cost of performance and/or original contract price to reflect such.  *See* section I.B., *supra*; *see* <u>Cavalier Clothes</u>, 51 Fed. Cl. at 418; <u>North Star Alaska</u>, 76 Fed.Cl. at 213; <u>Youngsdale & Sons Constr. Co. v. U.S.</u>, 27 Fed.Cl. 516, 541 (1993); <u>Servidone Const. Corp. v. U.S.</u>, 931 F.2d 860, 862 (Fed. Cir. 1991) (modified total cost claim accepted after court substituted reasonable bid for

contractor's bid; court also considered contractor's inexperience with soils encountered at worksite in making deduction from costs to extent that government contractor was responsible for added cost).  Notably, the <u>Servidone</u> court did not blindly toss out the contractor's entire claim, as DMJM asserts this Court should.  Therefore, cases claiming that the total cost method is "fraught with danger", such as the <u>Harkin</u> case cited by DMJM, are inapplicable to modified total cost claims.

The "house example" provided in DMJM's Memorandum bears no semblance to reality or this case.  *See* DMJM Memo, pp. 8-9.  DMJM tries to imply that the designer would have to defend itself from a $100,000 claim, while it was only responsible for $10,000 of those damages.  DMJM ignores the requirement that the contractor attribute all damages to the designer.  If a contractor fails to demonstrate such at trial, then a total cost claim would fail.  In other words, the elements necessary to assert a total cost claim exist to protect parties from the dangers DMJM claims could occur.  Moreover, a modified total cost approach takes into account contribution from other parties, so DMJM's argument that AMEC's entire claim should be thrown out as "legally insufficient" makes little sense.  *See* DMJM Memo, p. 9.

Thus, though the argument is largely moot due to the fact that AMEC submitted an actual cost claim, the preceding distinction demonstrates that DMJM is not entitled to judgment as a matter of law, regardless of which party's version

of the facts are accepted.  The case law cited by DMJM discussing total cost claims is not applicable to AMEC's actual cost claim.  Even accepting *arguendo* DMJM's contention that AMEC has a modified total cost claim, DMJM's total cost method opinions still do not apply.  As such, DMJM's Motion for Summary Judgment should fail.

       E.     *Total Cost Claims Are Not Per Se Barred as a Matter of Law*

Although AMEC does not rely on the total cost method, such claims are not inherently barred as a matter of law as asserted by DMJM.  A total cost approach can be justified because the lack of certainty as to the amount of damages should not preclude recovery where the fact of government responsibility for damages is clearly established.  J.D. Hedin Const. Co. v. U.S., 171 Ct. Cl. 70, 86-87 (1965). Even *unsegregated* damage awards, such as a total cost claim, can be granted under common law damage instructions that authorize an award of the difference between the contractor position before and after the breach.  *See* BRUNER & O'CONNOR CONSTR. LAW §19:94; Amelco Elec. v. City of Thousand Oaks, 27 Cal. 4th 228 (2002); Metro. Atlanta Rapid Trans. Auth. v. Green Intern, Inc., 235 Ga. App. 419, 421 (1998) (upholding $2.8 million total cost jury verdict awarded on instruction that "damages recoverable from the breach of contract are such as arise naturally and according to the usual course of things from such as the parties contemplated, when the contract was made, as the probable result of the breach.")

Moreover, the mere existence of a set of elements, which must be proved prior to recovery under the total cost method, demonstrates that at least in some cases, it will be applied. *See* DMJM Memo, p. 28. Even if AMEC did rely on the total cost method, it should at least have the opportunity to present evidence supporting the elements of such a claim at trial. DMJM has taken an unsupportable position that a party's claim which merely asserts damages calculated using a total cost theory should be instantly thrown out in summary judgment. Not only has DMJM failed to demonstrate that AMEC utilized the total cost method, the law demonstrates that AMEC would not be precluded from using that method if necessary. Accordingly, DMJM is not entitled to judgment as a matter of law, regardless of the facts, and its Motion should be denied.

## II. AMEC Does Not Rely on a "Cumulative Impact" Claim as Asserted by DMJM; Nor Are Cumulative Impact Claims "Wholly Rejected" As a Matter of Law

### A. Cumulative Impact Claims, Defined

DMJM defines a "cumulative impact" as the "impact on unchanged work which is not attributable to any one change but **flows from the synergy of the number and scope of changes** issued on a project" that is "**greater than the sum of its parts**." *See* DMJM Memo, pp. 9-10 (emphasis added). Traditional cumulative impact claims arise from the sheer magnitude of the number of changes on a project, and generally cannot be linked to any other specific cause.

**Cumulative impacts need not be traced to specific causes** of increased performance costs, but can **arise from changes which, when viewed retrospectively, were so many and had such effect on performance that there is a separately compensable impact claim**.

Betchel Nat'l, Inc., 90-1 BCA ¶ 22549, NASA BCA No. 1186-7, 1989 WL 160470 (N.A.S.A.B.C.A. 1989) (emphasis added). "A cumulative impact claim is thus for costs that **did not directly result from changes**." Pittman Constr. Co., 81-1 BCA ¶ 14847, GSBCA No. 4897, GSBCA No. 4923 (1980) (emphasis added).

B.   *AMEC Does Not Have a Separate Claim for Indirect Cumulative Impacts Reasoned on a Mysterious "Greater-Than-The-Sum-Of-Its-Parts" Theory as DMJM Asserts*

DMJM has attempted to frame AMEC's claim into a "cumulative impact" box in order to apply its hand picked legal analysis, valid or not, to AMEC's claim. Notably, DMJM never explains or demonstrates that AMEC relies on the cumulative impact theory. It merely makes the conclusory allegation in one sentence in its Memorandum, without explaining the basis thereof. *See* DMJM Memo, p.15. Likewise, DMJM's expert does not provide any evidence, examples or explanations for his conclusory statement that "[a]ll of [AMEC's] damages are pursued under the cumulative impact theory." *See* Casey Affidavit, p. 4 (footnote 1 appears to be flawed support for a total cost claim; it does not explain the cumulative impact assertion whatsoever). Therefore, AMEC's evidence presented above in the Statement of Facts section, is unrefuted.

In contrast to AMEC's claim, "cumulative impact" claims historically arose from disputes between contractors and the government over whether an *accord and satisfaction* had occurred regarding issues that were dealt with in change orders executed on the job.  *See, e.g.*, <u>Beaty Elec. Co., Inc</u>., 90-2 BCA ¶ 22829, EBCA No. 408-3-88, 1990 WL 32047 (1990) (if change order language does not contain waiver language, it covers only the listed costs of the changed work).  The government would naturally argue that the contractor could not assert later claims for damages (indirect impacts) that were not contemplated in the change order, and that only the damages (direct impacts) occurring at that time were compensable.  With this backdrop in mind, DMJM's attempt to apply "cumulative impact" cases in its analysis is completely out of the context intended to be addressed by those decisions, nor can any portion of AMEC's claim be characterized as a "cumulative impact claim" as contemplated by those cases.

Any portion of AMEC's claim that could even arguably be regarded as cumulative (DMJM points to none) is not a "cumulative impact claim" in the sense that DMJM describes.  It is not some vague, greater-than-the-sum-of-its-parts result of a multitude of change orders that transcends causation and rises to the level of a separate claim.  Rather, AMEC's damages are only cumulative in the sense that they were caused by a "ripple effect" that was catalyzed by DMJM's woefully inadequate design.  As the starting point of the Project, DMJM's

defective design is a focal point, in retrospect, from which the myriad of problems on this job arose.  In other words, the additional costs, delays and lost productivity were <u>directly</u> caused by DMJM's negligence.

AMEC's claim can be distinguished by AMEC's ability to point to itemized damages.  *See generally,* NeSmith Affidavit; Ralston Affidavit, ¶¶ 42-43.  Despite DMJM's efforts to portray AMEC's claim as vague, both AMEC's damages and the cause thereof, DMJM's defective design, are resoundingly real.  Unlike a traditional cumulative impact claim, AMEC's increased performance costs have been traced back to a specific cause, DMJM, and are the direct result of its poor design.  *See generally,* Guedelhoefer Affidavit, O'Connell Affidavit, NeSmith Affidavit & Ralston Affidavit.

### C.  *The Cumulative Impact Theory is Well-Recognized by the Courts*

DMJM goes on *ad nauseam*, parroting one author's negative opinions of cumulative impact claims, not from valid case law, but from a journal.  *See* DMJM Memo, pp. 10-13.  DMJM concludes its reiteration of "authority" with an obscure, unpublished opinion claiming that the theory is "too speculative" under Nevada law.  *See* DMJM Memo, pp. 12-13.  The unpublished opinion recites no facts for a proper determination of the underlying basis of the court's conclusion, nor does it cite to any other authority to show support for its conclusion.  *See* <u>In re Venetian Lien Litig</u>., 2004 WL 3265025 (Nev. Dist. Ct., 2004) (unpublished).  In short,

DMJM has provided acutely minimal, if any, support for its contention that the cumulative impact theory should be outright rejected, especially in the face of the great weight of authority set forth below.

That courts recognize the cumulative impact theory as a viable means of recovery cannot be reasonably debated.   In <u>Ingalls Shipbuilding Div., Litton Systems, Inc.</u>, 78-1 BCA P 13038, ASBCA No. 17579, 1978 WL 2301 (A.S.B.C.A. 1978), the Board of Contract Appeals highlighted its "[r]ecognition of the reality of [the cumulative impact] effect."

> In effect the [government's] argument is that the effect from all the changes cannot be greater than the sum of all the parts thereof.  We do not agree.  **The entire basis for recovery of an impact or ripple claim is that the effect of changes can and does create costs beyond those attributable to the changes themselves**.

<u>Id</u> (emphasis added).   In another case, <u>David J. Tierney, Jr., Inc.</u>, 88-2 B.C.A. (CCH) ¶ 20,806, 1988 GSBCA LEXIS 151 (1988), "cumulative impact" costs were defined as follows:

> **'Cumulative impact' costs are costs associated with impact on distant work, and are not readily foreseeable or, if foreseeable, [are] not readily computable as direct impact costs**.  The source of such costs is the sheer number and scope of the changes to the contract.  **The result is an unanticipated loss of efficiency and productivity which increases the contractor's performance costs and usually extends his stay on the job**.

<u>Id</u>., at *206-207 (emphasis added).   In <u>Tierney</u>, the contractor entered into a contract to construct a federal building for a lump sum price of approximately $1.4

million, to be completed within 365 calendar days.   During construction the government issued 44 change orders, impacting a total of 133 separate items.  Id. Tierney was paid an additional $79,000 for those changes but complained that collectively they had delayed its completion of the job.  Id.  The Board awarded Tierney $179,093, plus interest, summarizing the rationale for its decision as follows:

> Principally, we find on balance that the Government's **numbers changes to the contract impeded appellant's completion of the job, substantially increasing its costs and eradicating its anticipated profit.  Although we are not able to pinpoint, day by day, the effect of each change on each item of work, we do find that some of those changes had a cumulative impact on job progress as a whole, for which appellant is entitled to compensation**.  In addition, the negotiated prices of the contract changes failed to address this cumulative impact experienced, and therefore do not preclude appellant's claim by way of an accord and satisfaction. We also find, however, that certain deficiencies in appellant's performance contributed to the losses it incurred, and we consider those deficiencies in determining the amount of compensation appellant is due.
>
> **Our award is not based upon any specific quantum associated with appellant's individual claims.  Rather, the award is in the nature of a jury verdict based upon a perceived balance of liability between appellant and respondent for overall delay in the completion of the construction project as a whole**.

Id. at *4-5 (emphasis added).

Therefore, although it is DMJM, and not AMEC, that has attempted to put the label of "cumulative impact" on AMEC's claim, regardless of whether it is suitable, DMJM's position that cumulative impact claims should not be recognized

is blatantly contrary to the law.  *See also*, <u>Atlas Constr Co., Inc.</u>, 90-2 BCA ¶ 22,812, 1990 WL 27623 (G.S.B.C.A. 1990) (cumulative impact claim recognized); <u>Hensel Phelps Constr. Co. v. General Services Admin.</u>, 01-1 BCA ¶ 31249, 2001 WL 43961 (G.S.B.C.A. 2001) (also recognizing cumulative impact claim); <u>Charles G. Williams Constr. Inc.</u>, 89-2 BCA ¶ 21733, ASBCA No. 33766, 1989 WL 32981; <u>Saudi Tarmac. Co. Ltd.</u>, 89-3 BCA ¶ 22132, ENG BCA No. 484, 1989 WL 98743; <u>Centex Bateson Constr. Co.</u>, 99-1 BCA ¶ 30153, VABCA No. 4613, 5162, 5165, 1998 WL 853085 (Dec. 3, 1998); <u>State v. Guy F. Atkinson Co.</u>, 187 Cal.App.3d 25, 231 Cal.Rptr. 382 (1986).  Even DMJM's Memorandum sets forth an overview of cases that recognize cumulative impacts and general requirements established for a contractor to assert such a claim.  *See* DMJM Memo, p. 26.

Accordingly, there is no basis for "wholly rejecting" the cumulative impact theory as DMJM contends.  For example, in <u>Betchel Nat'l, Inc.</u>, 90-1 BCA ¶ 22549, NASA BCA No. 1186-7, 1989 WL 160470 (N.A.S.A.B.C.A. 1989), it was noted that the contractor only offered RFI's as the basis of its cumulative impact claim and "produced no contemporaneous documentation that substantiates the extent of the cumulative impact claimed."  <u>Id</u>.  However, the court did not throw out Betchel's entire claim; rather, the court "elected to make an independent estimate of the cumulative impact costs."  <u>Id</u>.  Notably, AMEC has a litany of contemporaneous documentation that substantiates its claim (cumulative impact or

not).   *See* NeSmith Affidavit, Exhibit D; Guedelhoefer Affidavit, Exhibit C; O'Connell Affidavit, Exhibit B.

DMJM claims the viability of the cumulative impact theory has been "thoroughly vitiated in light of its unreliable nature and the advancements in technology enabling contractors to track costs associated with delay."  *See* DMJM Memo, p. 10.  DMJM's logic is inapplicable here because AMEC meticulously tracked costs.  *See* Ralston Affidavit, ¶¶ 17-23.  Therefore, regardless of whether AMEC is relying on a cumulative impact theory for the recovery of damages caused by defects in DMJM's design, DMJM has failed to establish that reliance on such a theory "necessitate[s] outright rejection by this Court."  DMJM's position is simply not supportable by the law.

**III.   DMJM's Assertion that Causation Cannot be Established under the Total Cost Method and Cumulative Impact Theory is Clearly Wrong; AMEC Will Establish Causation at Trial**

DMJM tries to manufacture an issue with establishing causation, both as a legal issue and as an issue of fact.  First, DMJM tries to establish, as a matter of law, that causation cannot be established using the total cost method or cumulative impact theory, and thus, according to DMJM, AMEC's negligence action should fail.  *See* DMJM Memo, pp. 17-22.  Next, DMJM attempts to show that, as a matter of fact, there is a "complete absence" of causation in AMEC's claim, which it inadequately supports by providing one example of an incident relating to only a

portion of AMEC's claim.[4]  *See* DMJM Memo, pp. 22-25.  This has already been addressed, *supra*, in AMEC's Statement of Facts above.

As a preliminary matter, AMEC is not relying on either the total cost method or cumulative impact theory to prove causation as DMJM asserts.  Therefore, DMJM's entire legal argument under "Point II" in its Memorandum is moot.  *See* DMJM Memo, pp. 17-25.  However, for the purposes of establishing that DMJM's Memorandum is wholly without merit, both factually and as a matter of law, a brief discussion is warranted.

To begin, DMJM cites to no authority that supports its position that the total cost method and cumulative impact claims are inapplicable to negligence actions. The <u>Huber</u> case does not say that the total cost method is inapplicable in negligence actions against the designer.  In that case the contractor simply failed to establish its total cost claim on the facts.  <u>Huber, Hunt & Nichols, Inc. v. Moore</u>, 67 Cal.App.3d 278, 136 Cal.Rptr. 603 (1977).  First, the contractor's claim against the designer in <u>Huber</u> failed to take into account the change of work authorized by the change orders, the moneys paid and the credits allowed pursuant to such, and

---

[4] To dispel any confusion created by DMJM's Memo, although DMJM labels this section "AMEC Cannot Establish Proximate Cause", its discussion following that title has nothing to do with proximate causation, which is causation as a matter of law pertaining to the issue of foreseeability.  Despite the misnomer, DMJM's argument here is clearly directed at cause-in-fact, or "but for" causation, as evidenced by its discussion of the girder drop incident.  Regardless of the label, DMJM's argument is without merit.

the moneys and time credits which the contractor recouped in its settlement with owner.  Id. at 308-309, n. 21.  AMEC has accounted for all of these things.  *See generally,* NeSmith Affidavit; Ralston Affidavit, ¶¶ 42-43.

More importantly, the contractor in Huber failed to present any supporting evidence at trial of its costs, either by using accepted cost allocation principles or by expert testimony.

> Nor does the mere fact that plaintiff's books and records do not, in segregated form, show the amounts of the increased costs attributable to the breaches give it automatic license to use the 'total cost' method. **Contractors rarely keep their books in such fashion. Such failure, however, normally does not prevent the submission of <u>reasonably satisfactory proof</u> of increased costs incurred during certain contract periods or flowing from certain events based, for instance, on <u>acceptable cost allocation principles</u> or on <u>expert testimony</u>**[.]

Id. at 309 (quoting Boyajian v. United States, 23 F.2d 1231, 1242, 191 Ct.Cl. 233 (1970)).  Though the contractor tried to introduce a computer printout of its costs, it utterly failed to introduce the original records or expert testimony to support its conclusions drawn from the absent project documentation.

> It seems manifest that the computer printout was based upon records of original entry such as invoices for materials, cancelled checks for labor and material, time sheets and other normal and customary business records universally used in the business world…**but they were not produced at trial and no calculations therefrom were prepared**. **The failure is not explained**.  If the computer printout was not organized in a manner to indicate the specific cause of particular cost overruns, **a qualified accountant should have been able to make the calculations from the original records which were the source for the data fed into the computer.  But nobody took the**

**time and effort to make any such calculations. No explanation is given for the failure**.

Id. at 309.

In contrast, AMEC has prepared numerous expert reports, based on contemporaneous project documentation, to demonstrate: (1) that DMJM was negligent in performing its duties as the designer for the Shark River Bridge Project, (2) that as a result of DMJM's negligent performance, AMEC experienced delays and disruptions to its work, and (3) the amount of damages AMEC incurred as a result of the delays and disruptions attributable to DMJM.  *See* NeSmith Affidavit, Exhibit D; Guedelhoefer Affidavit, Exhibit C; O'Connell Affidavit, Exhibit B.  There is a litany of project documentation to support these claims, and costs have been itemized and segregated.  Finally, unlike Huber, AMEC will have these experts testify at trial.

Nor does DMJM's case law support its contention that cumulative impact claims may not be asserted in negligence actions.  DMJM provides one example of a cumulative impact claim in a contract context, but it does not stand for the proposition that the theory categorically may not be applied in an action against a negligent designer.  In re Venetian Lien Litig., 2004 WL 3265025 (Nev. Dist. Ct., 2004) (unpublished).  DMJM's theory is essentially that because causation is an element of a negligence claim, and because Venetian, an unpublished opinion based on Nevada law, says that cumulative impacts claims are only used when the

32

contractor is unable to tie specific damages to specific breaches, then, at least according to DMJM, causation cannot be established in negligence actions using a cumulative impact theory.  *See* DMJM Memo, p. 18.  DMJM's argument is illogical and incorrect.

Venetian cannot be interpreted as DMJM proposes because cumulative impact claims have succeeded numerous times, which necessarily means that causation was established in those cases.  *See* Atlas Constr Co., Inc., 90-2 BCA ¶ 22,812, 1990 WL 27623 (G.S.B.C.A. 1990) (cumulative impact claim recognized); Hensel Phelps Constr. Co. v. General Services Admin., 01-1 BCA ¶ 31249, 2001 WL 43961 (G.S.B.C.A. 2001) (also recognizing cumulative impact claim); Charles G. Williams Constr. Inc., 89-2 BCA ¶ 21733, ASBCA No. 33766, 1989 WL 32981; Saudi Tarmac. Co. Ltd., 89-3 BCA ¶ 22132, ENG BCA No. 484, 1989 WL 98743; Centex Bateson Constr. Co., 99-1 BCA ¶ 30153, VABCA No. 4613, 5162, 5165, 1998 WL 853085 (Dec. 3, 1998); State v. Guy F. Atkinson Co., 187 Cal.App.3d 25, 231 Cal.Rptr. 382 (1986).  If DMJM is trying to assert that causation is an element of negligence causes of action, but not contract causes of action, then it is plainly wrong.  "The causation requirement in contract law is similar to that in tort law."  Point Productions A.G. v. Sony Music Entertainment, Inc., 215 F.Supp.2d 336, 341 (S.D.N.Y. 2002); McCormick, HANDBOOK ON THE LAW OF DAMAGES, § 73, at 261 (1935) ("The necessity of establishing a causal

connection between the defendant's conduct and the harmful consequence is equally present in cases of breach of contract as in the field of wrongs.").  By deduction, if the cumulative impact theory has been properly applied in contract actions, such as in the above examples, which necessarily required that causation be established, then clearly causation can be established using similar methods in negligence causes of action.

When courts refer to cumulative impact damages as "unforeseeable", the term is being used synonymously with "incalculable" in reference to the time the change order is issued; this has nothing to do with foreseeability for the purposes of establishing legal causation.  DMJM's own authority acknowledges this: "**To use the term 'cumulative' implies that the disruption is somehow causally different from local disruption and <u>this is simply not the case</u>**." Michael R. Finke, *Claims for Construction Productivity Losses*, 26 Pub. Cont. L.J. 311, 337-338 (Spring 1997) (emphasis added).

> All impact costs are more or less the direct results of changes. There are changes, and there are increases in cost. If all other causes of increased costs are factored out, what remains are those increased costs caused by changes. **'Direct' or 'indirect' ('remote' might be a better word), the <u>causation is there</u>**. All costs are ultimately accounted for as labor, material, or burden, and this is just as true of impact costs as it is of other kinds. In the pricing out of a change, the contractor is given additional payment to compensate it for additional labor hours and material charges, plus burden. The problem is almost a tort problem-foreseeability. When pricing the changes individually, the contractor may not have taken into account the synergistic effect of all the changes collectively, and it may therefore recover in the

changes only those impact costs relatively easy to foresee, i.e. those that are customarily referred to as 'direct' impact costs. **Failing to foresee the so-called cumulative impact costs, the contractor fails to claim them, and thereby obtains <u>less than full compensation</u> for the change being negotiated**.

<u>Pittman Constr. Co.</u>, 81-1 BCA ¶ 14847, GSBCA No. 4897, GSBCA No. 4923 (1980) (emphasis added).

Thus, though certain damages may be unforeseeable, i.e. incalculable, at the time of a change order, it does not mean that causation cannot be established for cumulative impacts. The "ripple effect" caused by a poor design creates a direct chain of causation. It is a basic fundamental concept that an inadequate design can cause productivity problems down the line, and such inefficiencies are clearly foreseeable for the purposes of proximate causation. DMJM is presuming, at a premature stage of litigation, what AMEC intends to present at trial. AMEC has more than sufficient evidence of causation, though discovery is ongoing. *See generally,* Ralston Affidavit, Guedelhoefer Affidavit, NeSmith Affidavit and O'Connell Affidavit.

**IV.    There is No Legal Requirement that Specific Damages Must be Tied to Specific Breaches; Reasonable Certainty is the Standard**

Even if the contractor cannot allocate specific damages to specific breaches, this does not mean that the contractor cannot establish actual and proximate cause.

**Because of the complexity of causation linkage and cost accounting issues, proof of damages is required only to a**

**"reasonable certainty," which does not require impracticable linkage of specific damages to multiple specific breaches**.

*See* BRUNER & O'CONNOR CONSTR. LAW § 19:70.  For example, in <u>Metro. Atlanta Rapid Transit Auth. v. Green Int'l, Inc.</u>, 235 Ga.App. 419, 509 S.E.2d 674 (1998), a contractor sought recovery of $3.4 million for cost overruns resulting from numerous defects in the contract plans and specifications discovered during construction of a transit station.  Because the plans were in a state of "total disaster," the contractor submitted numerous requests for information and received hundreds of new or revised drawings which was described as a "design-as-you-go situation."  <u>Id</u>. at 420, 421.  The contractor's claim was submitted to a jury under an instruction that "damages recoverable from a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach."  <u>Id</u>. at 421.  The jury returned a verdict in favor of the contractor for $2.8 million. Id. at 419.

On appeal, the owner argued that the award was nothing more than a "total cost method" or "modified total cost method" and that the contractor had failed to prove its damages with reasonable certainty because specific damages were not proven to have been caused by specific design deficiencies.  <u>Id</u>. at 422.  The court of appeals, in affirming the judgment, held that the contractor was obliged only to show "with reasonably certainty the total amount of damages and the degree to

which these damages are attributable to the defendant…to support an award." Id. at 423. *See also* Neal and Co., Inc. v. U.S., 945 F.2d 385 (Fed. Cir. 1991) (while contractor had trouble quantifying and documenting increased labor costs for out of sequence work, it was clear disruption had occurred due to defective design and therefore recovery would not be denied); Clearwater Assocs. v. Hicks Laundry Equip. Corp., 433 So.2d 7 (Fla.App.2.Dist., 1983) (uncertainty as to precise amount of, or difficulty in proving, damages does not preclude recovery if there is some reasonable basis in evidence for amount awarded).

## <u>CONCLUSION</u>

For the reasons discussed in detail above and especially because AMEC's damages are not calculated pursuant to the Total Cost Method or the Cumulative Impact Theory, DMJM's Motion for Summary Judgment is without merit and should be denied in its entirety.

Respectfully submitted, this 12th day of January, 2009.

**STARKEY, KELLY, BAUER,**
 **KENNEALLY & CUNNINGHAM**
Attorneys for Plaintiff
AMEC Civil, LLC


By:      /s/Kevin N. Starkey
        Kevin N. Starkey, Esq. (KS 4872)

Gregory S. Martin, Esq., *Pro Hac Vice*
Brian P. Heald, Esq., *Pro Hac Vice*
**MOYE, O'BRIEN, O'ROURKE,**
 **PICKERT & MARTIN, LLP**
800 S. Orlando Avenue
Maitland, Florida 32751

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the undersigned has this date served the foregoing document in the above-captioned matter upon **Robert E. Ryan, Esq.**, Connell Foley, LLP, 85 Livingston Avenue, Roseland, New Jersey 07068, and **Timothy F. Hegarty, Esq.**, Zetlin & DeChiara, LLP, 80 Bloomfield Avenue, Caldwell, New Jersey 07006 via *Electronic Delivery*.

Dated:  January 12, 2009

/s/Kevin N. Starkey

KEVIN N. STARKEY, ESQ.
