[NOT FOR PUBLICATION]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————— :
                                                      :
AMEC CIVIL, LLC,                                      :
                                                      :
            Plaintiff,                                :          Civil Action No. 06-64 (FLW)
                                                      :
      v.                                              :
                                                      :               OPINION
DMJM HARRIS, INC.,                                    :
                                                      :
            Defendant/Third-Party Plaintiff, :
                                                      :
      v.                                              :
                                                      :
HARDESTY & HANOVER, LLP,                              :
                                                      :
            Third-Party Defendant.                    :
———————————————————— :

## WOLFSON, United States District Judge:

Presently before the Court are two motions by Defendant, DMJM + Harris, Inc. ("Defendant" or "DMJM"), for summary judgment, pursuant to Fed. R. Civ. P. 56, to dismiss Plaintiff's, AMEC Civil, LLC ("Plaintiff" or "AMEC"), (1) cumulative impact theory of causation and total cost, or modified total cost, method of damages,[1] and (2) request for special damages for attorney's fees, costs, and expenses.  In its Complaint, Plaintiff alleges that it suffered damages in excess of $52 million based on Defendant's negligence in connection with its engineering design work for a construction project.

————————————————

[1]Third-Party Defendant Hardesty & Hanover, LLP joined in Defendant's motion to limit damages by letter dated December 30, 2008.

On its first motion, Defendant argues that it is entitled to summary judgment on Plaintiff's causation theory because AMEC relies on (1) the cumulative impact theory to prove its claim and (2) a marginally modified total cost method to prove its damages, which are both wholly unreliable methods and should be rejected by the Court.  Further, DMJM argues that AMEC has not attempted to apportion any damage allegedly caused by the purported negligence of DMJM from the damage caused by other sources. Plaintiff, however, opposes Defendant's first motion on the grounds that its claim is not calculated on a total cost basis or a modified total cost basis, and even it were, it would not be barred as a matter of law.

On its second motion, Defendant argues that it is entitled to summary judgment on Plaintiff's request for fees and costs as special damages.  Plaintiff opposes this motion on the grounds that the Section 914 of the Restatement (Second) of Torts allows it to recover attorneys fees and costs, as special damages, which were incurred in third party litigation where it was required to act to protect its interests.

The Court having considered the moving, opposition and reply papers, and the parties' oral argument on June 24, 2009, for the reasons stated herein, Defendant's motion to limit damages is granted in part and denied it in part, and Defendant's motion to dismiss Plaintiff's request for fees and costs is granted.  AMEC will be afforded the opportunity to present proofs to the jury that it, to a reasonable degree of certainty, suffered actual damages attributable solely to DMJM's negligence; AMEC, however, will not be able to avail itself of the modified total cost and cumulative impact theories to do so.  In other words, Plaintiff will have to prove that its cost codes accurately represent

2

costs attributable solely to DMJM's action.  The Court also dismisses Plaintiff's claim for attorneys fees and costs as special damages.


## I.  BACKGROUND AND PROCEDURAL HISTORY

In the interests of judicial economy, this Court will incorporate the facts and procedural history as outlined in its previous opinion and supplement it accordingly. See AMEC Civil, LLC v. DMJM Harris, Inc., No. 06-64, 2007 WL 433328 (D.N.J. Feb. 6, 2007).  The Court recounts relevant facts, which are not disputed unless otherwise noted.

On December 16, 1999, AMEC bid $43,384,644 to construct the Shark River Bridge on Route 35 in Belmar, New Jersey ("Project").  Ted NeSmith, Expert Witness Report, dated Sept. 30, 2008 ("NeSmith Report"), Bid, p. 52.  On February 10, 2000, AMEC entered into an agreement ("Contract") with the New Jersey Department of Transportation ("NJDOT") to perform construction work on the Project.  Zetlin Cert. ¶ 4.  NJDOT hired DMJM as the Project's engineering design consultant.  Id. ¶ 9.  While NJDOT had a contract with both DMJM and AMEC on the Project, there was no contract between DMJM and AMEC.  Id. ¶¶ 10-11; Aff. of Grant R. Ralston ("Ralston Aff.") ¶ 11.  NJDOT and AMEC adjusted the contract amount  to $47,279,313 after including approved change orders and supplementary agreements.  Zetlin Cert. ¶ 4.  AMEC, however, alleges that due to DMJM's negligent performance on the Project,

AMEC suffered damages in the amount of $52,261,317.[2]  Aff. of Ted NeSmith ("NeSmith Aff.") ¶ 11.

AMEC worked on the Project for at least six years,[3] constructing a bridge that is approximately one mile long.  Boswell Aff. ¶ 5.  AMEC asserts that NJDOT believed that the "poor" design contract plans contained errors and omissions and wanted to "tear the plans" to look for design, dimensioning and constructability issues that would cause delay in the Project's completion.  Martin Cert., Ex. A, DMJM Harris Contact Memo, dated Mar. 19, 2002.  In addition, the Project plans "would almost have to [be] redesign[ed] - as in [they had to] recheck quantities and calculations, dimension[,] etc. -

---

[2]The parties dispute the actual amount expended and costs incurred during this project and subsequent litigation.  According to Defendant, AMEC expended $69,808.648 to complete the Project and incurred actual cost overruns of $24,779,390.  Aff. of Craig P. Casey ("Casey Aff.") ¶ 8 n. 1.  However, AMEC alleges that while a comparison between the budgeted costs, as reflected on the November 30, 2005 job cost report, and the costs incurred, as reflected on the July 31, 2008 job cost report, shows a difference in this amount, it does not reflect the total monetary damages of $52,261,317, which AMEC suffered as a result of DMJM's negligence.  NeSmith Aff. ¶ 11.  AMEC's total damage claim includes owned equipment costs, home office overhead, profit, interest, attorneys fees, expert fees, bond premiums, and liquidated damages.  Id.

[3]According to AMEC, the Project was originally scheduled to be completed within 32 months.  Ralston Aff. ¶ 12.  Substantial Completion was required by November 8, 2002, but was not achieved until June 8, 2005.  Aff. of Kenneth J. O'Connell, Ex. B, Analysis of Pre-Bid Schedules and Project Delays, dated Sept. 20, 2008 ("O'Connell, Ex. B"), at 2.  However, on October 10, 2001, NJDOT approved AMEC's Change Order No. 25, submitted on September 25, 2001, which extended the contract Substantial Completion date by 205 calendar days, from November 8, 2002 to June 1, 2003.  Id. at 10-11, 56.  Change Order No. 25 also changed the Final Completion date from January 2, 2003 to July 26, 2003, and the contract amount from $44,727,744.79 to $46,206,970.79.  Id. at 56.

In addition, NJDOT allegedly submitted Change Order No. 42 on April 22, 2003, and on May 2, 2003, NJDOT approved the change order, extending the Substantial Completion date 45 calendar days, from June 1, 2003 to July 16, 2003, and the Final Completion date from July 26, 2003 to September 9, 2003.  Id.  Further, it adjusted the contract amount from $46,467,582.51 to $46,647,020.51.  Id.  According to AMEC, unlike Change Order No. 25, NJDOT unilaterally issued Change Order No. 42, which AMEC did not sign.  Id.

of the remainder of the project to ensure that what is in the plans is correct." Martin Cert., Ex. A, Email from M. Dietrich to S. Lavelle & M. Seigfried, dated Mar. 20, 2002. Although AMEC alleges that DMJM's negligence and deficient design caused it to incur significant delays on the Project and increased costs of construction, resulting in excess of $52 million in damages, NeSmith Aff. ¶ 11, DMJM claims that its design was not deficient and did not cause AMEC to incur significant delays or increased costs.

## AMEC's Claims Against DMJM

AMEC retained Theodore NeSmith ("NeSmith"), a Certified Public Accountant and Certified Valuation Expert from Quantum Consulting Group, LLC ("Quantum"), who specializes in forensic accounting and business valuations. NeSmith Aff. ¶ 4. NeSmith summarized AMEC's damages claim in a "Monetary Entitlement" chart.[4] Casey Aff., Ex. A; NeSmith Aff., Ex. E. AMEC's damage request is comprised of (1) total damages in the sum of $36,488,077, which includes the $2,236,500 that NJDOT withheld from AMEC's contract balance as liquidated damages for belated attainment of substantial completion of the Project, and (2) AMEC's legal/expert fees, interest, and performance bond premiums, which increase its total monetary entitlement claim to $52,261,317. Casey Aff. ¶ 7. According to DMJM, approximately 60% or $20,248,657[5]

---

[4]AMEC alleges that NeSmith used recognized construction cost accounting principles, while DMJM alleges that he has relied on incorrect methodologies and flawed assumptions in creating AMEC's damages claim. See NeSmith Aff. ¶ 10; see generally Casey Aff.

[5]The Court notes that during oral argument, DMJM used a demonstrative to show that AMEC used the total cost approach to calculate its damage claim in the

of NeSmith's $34,251,577[6] damage claim is calculated using a modified total cost

approach.[7]  Id. ¶ 8.  However, AMEC disagrees and states that "various components  of

the labor inefficiency and lost productivity claim", by way of example, are computed by

discrete cost codes that were caused by DMJM's negligent actions "and computing the

difference between the budgeted amounts for those particular cost codes and the actual

costs incurred."  NeSmith Aff. ¶ 33.

_____

amount of $19,716,008, citing to NeSmith Report Exhibits D-K.  While this number is
different from the  $20,248,657 DMJM uses in its papers, the Court need not discuss
this discrepancy as it is nearly the same number and involves the same damages.

As discussed herein, this is the only portion of Plaintiff's damage calculation at
issue on Defendant's first motion, and thus, the Court's discussion with respect to this
motion will focus on this limited damage claim.  See n. 18, infra.  The remaining
$14,002,290 of the $34,251,577 damage claim, designated as "delay" damages in the
Monetary Entitlement chart, is comprised of "extended field overhead" and "extended
equipment and form costs," and the parties' arguments surrounding these damages,
such as the number of days of delay allegedly attributable to DMJM and AMEC's use of
Blue Book rates to calculate damages associated with AMEC-owned equipment, will not
be discussed on this motion.

[6]This number excludes the liquidated damages AMEC seeks in the amount of
$2,236,500.

[7]According to DMJM, AMEC's claim for excess material costs, for example, in the
sum of $1,998,535 is derived through a modified total cost analysis, as NeSmith
"excluded all cost codes where AMEC's actual material costs were less than its budgeted
costs.  As to certain other costs in this category, [NeSmith] simply compared actual and
budgeted costs without analyzing whether the material cost overruns were attributable
to quantity and/or unit pricing issues and also [whether] the changes were caused by the
actions of DMJM."  Casey Aff. ¶ 9.  AMEC, however states that it does not use the
modified total cost method to calculate damages here. Rather, AMEC contends that its
damages are calculated in a discrete manner in order to show those damages and its
excess material costs resulting solely from DMJM's negligent performance of its work.
NeSmith Aff. ¶¶ 12, 21-40.  DMJM avers that AMEC's cost accounting system did not
track the costs allegedly associated with DMJM's alleged design errors and omissions.
See Zetlin Reply Cert. ¶¶ 46-47.

**AMEC's Tracking of Costs**

According to AMEC, it maintained and utilized a cost code system to track the majority of the costs it incurred on the Project.  Ralston Aff. ¶¶ 11, 17.  AMEC alleges that it never stopped tracking costs, and indeed, increased its attention to such tracking; however, DMJM avers that AMEC had the ability to track changes and excess costs through its cost code system, but stopped tracking costs on an itemized code basis because it became an "administrative nightmare to try to have hundreds of small cost codes."  Zetlin Cert. ¶¶ 15-16 (citing to Zetlin Cert., Ex. 3, Ralston Test., dated Oct. 19, 2006 "Ralston Test.").[8]

DMJM, citing to Section 104.08 of the General Provision to AMEC's agreement with NJDOT, states that AMEC was obligated to record and report any event that AMEC believed to constitute a change to the Contract, Zetlin Cert. ¶¶ 17-18; Ex. 4; however, AMEC notes that it is not bound to DMJM by the contractual terms of its contract with NJDOT.  Ralston Aff. ¶ 11.  AMEC agrees that its contract with NJDOT required it to maintain a current Project schedule, Boswell Aff. ¶ 25, but states that it had no contract with DMJM, and DMJM cannot rely upon the provisions of the NJDOT contract. Ralston Aff. ¶ 11.

---

[8]According to AMEC, adding even more cost codes, as DMJM suggests AMEC should have done, would not have increased the accuracy of the job cost report.  Rather, it would only increase the complexity of the costing process.  Ralston Aff. ¶¶ 11-17.

### Damage Calculation Examples

AMEC disputes that it uses a total cost or modified total cost method to calculate its damages, and avers that it uses actual costs.  To demonstrate that it uses actual costs to calculate damages here, AMEC explains that it designated various cost codes, which are representative of the damages resulting from DMJM's negligence.  DMJM, however, disputes the accuracy of these cost codes, and even if they are accurate, whether they are attributable to DMJM alone.  For example, although cost codes 278012 and 278013 for deck pan labor reflect AMEC's actual cost of $70,897 as of AMEC's July 2008 job cost report, there were zero dollars budgeted for these codes as recorded in AMEC's November 2005 job cost report.  Casey Aff.¶¶ 13-14.[9]  According to DMJM, NeSmith's calculations include the difference between the actual cost and the zero dollars budgeted for these cost codes.  Casey Aff. ¶ 14.  However, AMEC states that it "seeks to recover the modified actual costs [versus] the modified budget amounts," Pl. Responsive Facts ¶ 28 (citing to NeSmith Aff., Ex. D), and thus, it does not use a modified total cost method.

By way of another example, AMEC seeks damages from DMJM for cost codes 273100, 25100, 276100, 276110, 278020, 278030, 280030, 282020, and 282022 for concrete form work at the Project.  Casey Aff. ¶ 15.[10]  While DMJM states that AMEC

---

[9]AMEC does not dispute this, but explains that these cost codes were added after construction began, as a result of changes to the work on the Project, and the original budget for these items was included elsewhere in the bid.  Ralston Aff. ¶ 23.
[10]Plaintiff notes that these codes are only a subset of all cost codes for which it seeks recovery from Defendant.  Pl. Responsive Facts ¶ 29.

incurred cost overruns from these work items in the amount of $2,579,206, Casey Aff. ¶ 15, AMEC alleges that this number only reflects the actual modified costs in excess of the modified budget.  NeSmith Aff., Ex. D.[11]

DMJM claims that AMEC's total damages include the entirety of the overruns in its damage calculations as well as items that cost less than the budgeted amount despite the Project continuing longer than expected.[12]  Casey Aff. ¶¶ 16-17.  In response, AMEC states that it selected the referenced codes and others to support its claim after carefully considering and determining the cost codes that captured increased and actual costs it incurred as a result of DMJM's negligence.  NeSmith Aff. ¶¶ 37-38; Ralston Aff. ¶¶ 42-43.  DMJM, however, counters that even if it is responsible for some design error or omission (which it disputes), AMEC has not, and cannot, show that all of these damages can be attributed solely to it.  Casey Aff. ¶16.

---

[11]Essentially, AMEC contends that it does not use a modified total cost method because instead of using incurred costs minus bid price, it uses actual modified costs incurred minus modified budget costs.  As discussed herein, at oral argument, AMEC asserts that these costs would not have existed but for DMJM's negligence, but it fails to offer any support for these contentions beyond conclusory allegations here.  See Part III.A., infra.

[12]While DMJM offers a drinking water example to show that AMEC seeks less money for actual expenses it incurred than it budgeted in its November 2005 job cost report despite the lengthier duration of the Project, Casey Aff. ¶ 18, DMJM concedes that this damage calculation is part of AMEC's extended field overhead claim, which is not at issue on this Motion.  See Df. Responsive Facts ¶¶ 11-12.  Thus, the Court will not address the parties arguments with respect to this contention.  See n. 5, supra.

9

## Examples of Project Complications

According to DMJM, since it was the Project's engineering design consultant and not the resident engineer, it had relatively little involvement in the Project construction phase.  Zetlin Cert ¶ 9; Ralston Aff ¶ 10.  Furthermore, DMJM states that AMEC cannot determine the causes of the various delays to the Project's completion: that is, DMJM avers that AMEC cannot show that the various delays it experienced, even if some were attributable to DMJM and other entities identified by AMEC, were the sole fault of DMJM.  Zetlin Cert. ¶ 14.[13]

For example, even though AMEC experienced equipment breakdowns, it disputes that its performance was delayed and disrupted by these breakdowns beyond what it anticipated at the time of its bid.  Ralston Aff.  ¶ 34.  DMJM attributes the three fires that occurred, one of which caused significant damage to elements of the bridge and required AMEC to develop an entire restoration proposal during the concrete curing portion of the Project, to AMEC's errors in using propane heaters.  Zetlin Cert. ¶¶ 9, 27

---

[13]While the Court is not addressing AMEC's claim for $14,002,290 in delay damages, some of the same events that fall into this delay aspect, which is not a part of this motion, see n. 5, supra, are also included in the labor inefficiency and lost productivity claims that are at issue here.  Those aspects of the job will be discussed herein with the focus on the labor inefficiency and lost productivity claims.  See, e.g., concrete pilings, diaphragm fire, and girder drop.  At times in this opinion, the Court uses the word "delay," which is referred to herein because of extra work that AMEC was allegedly required to perform, which increased Plaintiff's labor costs.  Ultimately, the issues of delay, labor inefficiency and lost productivity are inextricably intertwined.

(citing Ex. 9).[14]  AMEC disputes that its subcontractors' and sub-consultant's

performance delays on the Project delayed AMEC's critical path[15] and performance on

the Project, and further alleges that its claim here is for the delays attributable to

DMJM, only.  See O'Connell Aff. ¶¶ 11, 14 & n. 1, 15; Pl. Response to Df's Facts ¶ 43 .

On July 29, 2002, AMEC's crew dropped a girder into the Shark River and girder

erection was suspended pending investigation.  Bowsell Aff. ¶¶ 20-22.  AMEC concedes

that occurred, but adds that "DMJM took part in directing AMEC's efforts during girder

erection and directed that the beam not be welded to the steel plate while girder erection

was in progress."  Pl. Facts ¶ 44 (citing Ralston Aff. ¶ 28).  The parties dispute whether

AMEC contemporaneously admitted responsibility for this incident.  Boswell Aff. ¶ 23;

Ex. B & C.  AMEC admits that the Occupational Safety and Health Administration

("OSHA") issued a citation and fee, but avers that it contested the citation and only had

to pay a reduced fine.  Ralston Aff. ¶ 30.  Plaintiff disputes that "NeSmith's damages

calculation inappropriately includes $128,826 ($103,826 of labor inefficiency and lost

productivity cost overruns and $25,000 of excess material costs)" for this incident,

Casey Aff. ¶ 20, and alleges that NeSmith's calculation is based upon the actual costs

---

[14]AMEC disputes that its errors caused the fires and claims that it had
successfully used heaters for concrete curing for years without an issue.  Instead, AMEC
illogically claims that DMJM's deficiencies affected the Project's schedule, which forced
AMEC to cure concrete during extreme winter conditions.  Ralston Aff. ¶¶ 35-39.
    [15]"The critical path is the sequence of activities that must be completed on
schedule for the entire project to be completed on schedule.  Generally, if an activity on
the critical path is delayed, the entire project will be delayed."  O'Connell Aff. ¶ 14 n. 1.

incurred resulting from DMJM's negligence.  Pl. Responsive Facts ¶ 47 (citing NeSmith Aff.; Ralston Aff. ¶¶ 42-43).  AMEC alleges that even though it "compares budgeted and actual costs in computing its labor inefficiency and lost productivity claim, this comparison between budgeted and actual costs does not make AMEC's claim a total cost or modified total cost claim."  Pl. Facts ¶ 15.  Rather, AMEC avers that Quantum along with AMEC's management "identified the discrete cost codes which were impacted by DMJM's negligence and used only those codes in calcualting its Labor Inefficiency/Lost Productivity claim."  NeSmith Aff. ¶ 37.  DMJM, however, disputes AMEC's allegation and avers that this calculation is part of NeSmith's modified total cost method.  Casey Reply Aff. ¶¶ 6-9; Zetlin Reply Cert. ¶¶ 3-6.

According to DMJM, AMEC claims damages from DMJM for the same categories of delay and disruption damages that AMEC seeks from NJDOT, see Zetlin Cert. ¶¶ 35-38, Exs. 18-19, but AMEC disagrees.  AMEC disputes DMJM's allegation that it "does not deduct, segregate or attribute the damages sought from DMJM from any damages AMEC alleges were caused by NJDOT for reasons other than DMJM's design", Df. Facts ¶ 50; Zetlin Cert. ¶ 40; AMEC continues that its claims against DMJM have been adjusted by deducting those damages which are solely NJDOT's responsibility.  NeSmith Aff. ¶ 11, n. 1.  Finally, AMEC points to NeSmith's expert report for an explication of its damages.  NeSmith Report.

**Procedural History**

On January 6, 2006, AMEC filed its Complaint against DMJM alleging

professional negligence arising out of the allegedly deficient design of the Shark River

Bridge Project in Monmouth County, New Jersey.  On July 21, 2006, DMJM filed a

Motion to Dismiss contending: (1) that dismissal was appropriate because NJDOT was

an indispensable party who could not be joined pursuant to Fed. R. Civ. P. 19; (2) that

the Court should abstain from exercising jurisdiction pursuant to the Colorado River

Abstention Doctrine; and (3) that AMEC failed to properly plead diversity jurisdiction.

Following a hearing on October 23, 2006, this Court denied DMJM's Motion to Dismiss

finding that there was diversity jurisdiction, that the Colorado River Abstention

Doctrine was not applicable, and that NJDOT was not an indispensable party.

Specifically, the Court was not convinced by DMJM's argument that if AMEC were

allowed to proceed against NJDOT in state court and against DMJM in federal court,

DMJM would be subject to inconsistent obligations.

Thereafter, on November 6, 2006, Defendant DMJM filed a Motion for

Reconsideration pursuant to Local Rule 7.1(I).  DMJM argued that this Court should

reconsider its October 23, 2006 Order to prevent manifest injustice; the Court should

dismiss this matter because, according to Defendant, the actions in "State Court and

Federal Court are virtually identical" and that if both actions "are allowed to proceed

there will be an enormous duplication of evidence; months of trial testimony in both

13

actions will be identical; and the risk to DMJM of inconsistent obligations will be enormous."  Subsequently, on November 13, 2006, DMJM filed an Answer to AMEC's Complaint and set forth twenty affirmative defenses, and on December 4, 2006, AMEC filed a Motion to Strike Defendant's First, Sixteenth, Seventeenth, and Twentieth Affirmative Defenses.  On November 13, 2006, DMJM filed an Answer and a Third-Party Complaint against Hardesty & Hanover, LLP ("Third-Party Defendant" or "Hardesty"), DMJM's subconsultant.  On February 6, 2007, the Court denied DMJM's Motion for Reconsideration and granted in part and denied in part AMEC's Motion to Strike.  In May 2007, the action was stayed pending an unsuccessful mediation; the stay was lifted in March 2008.

On November 28, 2008, DMJM filed its first Motion for Summary Judgment to dismiss Plaintiff's cumulative impact theory of causation and total cost method of damages on the grounds that AMEC is unable to present a legally cognizable claim for damages because AMEC does not apportion any delays and resulting damage caused by other sources.  Specifically, DMJM argues that: (1) the Court should reject the cumulative impact theory and total cost method entirely; (2) the Court should dismiss AMEC's claims because the cumulative impact theory and total cost method of damages are inapplicable in negligence actions because the plaintiff cannot establish actual or proximate cause; and (3) even if the Court were to find that the cumulative impact

theory and total cost method are viable here, AMEC cannot establish any of the four elements[16] required to recover on such theories in this case.

Plaintiff opposes this Motion, arguing that its damages are not calculated on a total cost basis or a modified total cost basis, and even they were, they would not be barred as a matter of law here.  In addition, Plaintiff asserts that it will establish causation at trial and that there is no legal requirement that specific damages be tied to specific breaches, rather reasonable certainty is the standard.  For the reasons stated herein, the Court grants Defendant's motion to limit damages in part and denies it in part.

On March 17, 2009, Defendant filed a second motion for summary judgment on Plaintiff's request for fees and costs as special damages.  Plaintiff argues that it is entitled to recover such damages in this case because it was required to bring a third party lawsuit against NJDOT for DMJM's negligent design.  For the reasons stated herein, the Court grants this motion for summary judgment and dismisses Plaintiff's claim for fees and costs.

---

[16]To recover under a total cost approach, the contractor must meet four criteria: The acceptability of the total cost or modified total cost method hinges on proof that (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses.  Propellex Corp. v. Brownlee, 342 F.3d 1335, 1339 (Fed. Cir. 2003).

## II.    STANDARD OF REVIEW

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported

16

motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Anderson</u>, 477 U.S. at 256-57. "A non-moving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" <u>Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs</u>, 982 F.2d 884, 890 (3d Cir. 1992) (quoting <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 500 (3d Cir. 1991)). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." <u>Woloszyn v. County of Lawrence</u>, 396 F.3d 314, 319 (3d Cir. 2005). Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. Credibility determinations are the province of the fact finder. <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

On its first motion, Defendant argues that Plaintiff uses a cumulative impact theory and modified total cost method[17] to calculate its $20,248,657 damage claim.[18] Defendant contends that these methods are unreliable and the Court should not permit AMEC to use them to recover damages here.  Further, Defendant asserts that Plaintiff is unable to show causation and thus, it is entitled to summary judgment with respect to these methods of proving damages.  On Defendant's second motion, Defendant argues that Plaintiff's third party litigation against NJDOT was not a natural and necessary consequence of DMJM's alleged wrongdoing and thus Plaintiff is not entitled to recover litigation fees against DMJM here.  The Court will address each of Defendant's arguments below.[19]

_____

[17]Regardless of whether Plaintiff used a total cost method or modified version of this method, Defendant contends that Plaintiff fails to meet the four elements required to recover on such a theory here.  However, DMJM concedes that AMEC does not use a straight total cost method; rather, DMJM contends that AMEC relies on modified total cost methodology to calculate the damages at issue on this motion.  See Reply at 11.

[18]In DMJM's Notice of Motion, it says that its first motion encompasses the entire Complaint, but in Footnote 5 of Defendant's Reply, Defendant states that it is only moving as to the cumulative impact theory and total cost or modified total cost method of calculating damages.  At oral argument, counsel for DMJM confirmed that its first motion is limited to Plaintiff's cumulative impact theory and total cost or modified total cost method of calculating damages, the $20,248,657 damage claim from NeSmith Report Exhibits D-K.  Accordingly, the Court's analysis with respect to this motion is limited to the parties' arguments relating to this damage claim.

[19]The Court notes that throughout Defendant's first motion, DMJM accuses Plaintiff of using a cumulative impact theory of causation and modified total cost method to calculate damages.  As discussed herein, this hybrid approach that AMEC uses to calculate damages is problematic in this case, where Plaintiff fails to show that the damages alleged are calculated to a reasonable degree of certainty or that they were

## A.      TOTAL COST & MODIFIED TOTAL COST METHOD

The United States Court of Appeals for the Federal Circuit and the Court of Federal Claims have emphasized that "the preferred way for a contractor to prove increased costs is to submit actual cost data because such data 'provides the court, or contracting officer, with documented underlying expenses, ensuring that the final amount of the equitable adjustment will be just that – equitable – and not a windfall for either the government or the contractor.'" North Star Alaska Housing Corp. v. United States,[20] 76 Fed. Cl. 158, 213 (Fed. Cl. 2007) (citing Propellex Corp. v. Brownlee, 342 F.3d 1335, 1338-39 (Fed. Cir. 2003) (quoting Dawco Constr. Inc. v. United States, 930 F.2d 872, 882 (Fed. Cir. 1991), overruled on other grounds by Reflectone v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995)).   To prove damages through the actual cost method, the plaintiff must provide the court with specific documentation of the expenses caused by the defendant's change or action; in maintaining the actual cost date, the plaintiff should segregate costs associated with the change where it is feasible to do so, particularly where it can anticipate submitting a large claim.  Cavalier Clothes, Inc. v. United States, 51 Fed. Cl. 399, 417 (2001) (citing Doninger Metal Products, Corp. v.

---

incurred solely due to the purported negligence of DMJM.

[20]North Star, relying on testimony from its expert, attempted to quantify the cumulative impact of the various breaches.  The court, however, determined that given the many problems that plagued his cost analysis, including assumptions that increased costs were attributable to the government's improper actions, failure to investigate anomalies, and faulty mathematics and assumptions in the cash flow analysis, "result[ed in] an expert opinion that bears none of the considerable evidentiary weight plaintiff piles upon it."  Id. at 215-16.

United States, 50 Fed. Cl. 110, 125 (2001); Delco Electronics Corp. v. United States, 17 Cl. Ct. 302, 321 (1989)).  The proof of the quantum of damages rests solely upon plaintiff, and it must be made "with sufficient certainty so that the determination . . . will be more than mere speculation."  Id. (quoting Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 295 F.2d 822, 831 (1961)).

Various courts, however, in complex contract claims, permit contractors to pursue damage methods in which their total costs in performing a contract are compared to the reasonable costs of providing the same services.  See S. Comfort Builders, Inc. v. United States, 67 Fed. Cl. 124, 146-47, 2005 WL 1804325 (Fed. Cl. 2005) (citing cases).  A total cost method is based on a formula that assumes that a contractor is owed the difference between the actual cost of the contract and the contractor's bid.  See Raytheon Co. v. White, 305 F.3d 1354, 1365 (Fed. Cir.), reh'g denied (2002); see also Sunshine Constr. & Eng'g, Inc. v. United States, 64 Fed. Cl. 346, 371 (2005).  To utilize the total cost method, a contractor must prove: "(1) the impracticability of proving its actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs." Propellex Corp. v. Brownlee, 342 F.3d 1335, 1339 (Fed. Cir. 2003) (citing Servidone Const. Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir. 1991)).

This method has always been viewed with disfavor, in part because of concerns about bidding inaccuracies, which can reduce the contractor's estimated costs, and

performance inefficiencies, which can inflate its actual expenditures.  <u>Servidone</u>, 931

F.2d at 861-62.  Further, it may allow the claimant to recover for costs that the claimant

itself caused and should bear.  <u>Raytheon Co. v. White</u>, 305 F.3d 1354, 1365 -1366 (Fed.

Cir. 2002) (citing <u>Boyajian v. United States</u>, 191 Ct. Cl. 233, 423 F.2d 1231, 1236 (1970)).

Not surprisingly, it has been used "only when no other mode was available and when the

reliability of the supporting evidence was substantiated."  <u>Raytheon</u>, 305 F.3d at 1365-

66 (quoting <u>WRB Corp. v. United States</u>, 183 Ct. Cl. 409, 426, 1968 WL 9146 (1968));

<u>see</u> <u>Hi-Shear Tech. Corp. v. United States</u>, 356 F.3d 1372, 1383 (Fed. Cir.), <u>reh'g en banc</u>

<u>denied</u> (2004).

  If a plaintiff cannot prove all four elements of a total cost method or if the

defendant can disprove one of them, the court must deny recovery under this method.

<u>Cavalier</u>, 51 Fed. Cl. at 418.  However, it may give rise to the use of an alternative

recovery of damages, the modified total cost method, which is used (1) to temper a total

cost award, and (2) to prevent the plaintiff from obtaining a windfall stemming from its

inability to satisfy all of the elements of the total cost method.  <u>Id.</u> at 418 (citing cases).

The modified total cost method addresses some of the objections to the total cost

method by adjusting it for a contractor's lack of proof in the requirements of the total

cost method.  <u>See</u> <u>Propellex</u>, 342 F.3d at 1339; <u>S. Comfort Builders</u>, 67 Fed. Cl. at 146 -

147; <u>Cavalier</u>, 51 Fed. Cl. at 418 ("[I]f appropriate, the modified approach is used where

the court finds it necessary to adjust either the original contract price or the total cost of

performance, or both. John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 715 (3d ed. 1995).").

In examining claims based on a total cost or a modified total cost methodology, courts require safeguards to ensure, to the extent possible, that the burden of excess expenditures falls on the party responsible for them. Raytheon, 305 F.3d at 1365-66 (citing cases). Under a modified total cost approach, a contractor still has the burden of proving the four elements required for the total cost method, but the burden is not as stringent. See Propellex, 342 F.3d at 1339, Servidone, 931 F.2d at 861; S. Comfort Builders, 67 Fed. Cl. at 146-47. The contractor must demonstrate that proving actual losses is either impossible or highly impracticable, and adequately separate any additional costs for which it is responsible.[21] See Cavalier, 51 Fed. Cl. at 418 (citing cases that were affirmed by the Federal Circuit).

### Total Cost Method in Negligence Actions

DMJM argues that the total cost method is inappropriate to calculate tort damages. See, e.g., Conam Alaska v. Bell Lavalin, Inc., 842 P.2d 148, 155, 1992 Alas. LEXIS 126 (1992) (holding that "the 'total cost' approach is disfavored for calculating

---

[21]As discussed herein, Defendant argues at length that this is a fatal issue for AMEC because it is unable to show that DMJM caused the injuries for which it complains. According to DMJM, AMEC fails to segregate the costs associated with DMJM's alleged negligence with its "contemporaneous assertions [of inefficiencies and increased costs] that NJDOT, NJDEP, the weather, the utilities, and several of its own subcontractors" caused. Reply at 8, 12.

tort damages"); <u>Huber, Hunt, Nichols v. Moore</u>, 67 Cal. App. 3d 278 (1977).  The parties

dispute whether <u>Huber</u> merely found that the plaintiff failed to establish its total cost

claim on the facts, or determined that the total cost method is inapplicable in negligence

actions.  The court did not hold that the total cost, or modified total cost, method could

<u>never</u> be used in negligence actions.  Rather, the <u>Huber</u> court refused to allow the

plaintiff, a contractor, to rely on the total cost method where the only evidence it offered

to prove damages failed to "specify the causal relationship between various cost

overruns and the alleged negligence of the defendant architects."  67 Cal. App. 3d at 278.

Further, the court found that "the sum and substance of [plaintiff's contract manager's]

testimony was merely to attribute every cost overrun to the fault of the Architects

without discrimination as to other possible causes.  He was admittedly compelled to do

this because plaintiff's exhibit . . . included extra costs within total costs without

discrimination or segregation and without explanation as to causation."  <u>Id.</u> at 296.

Thus, the court did not permit the plaintiff to use the total cost method to recover its

damages based on the facts in that case.

      In <u>Conam Alaska</u>, the Supreme Court of Alaska upheld the trial court's decision to

grant the defendant's motion to dismiss plaintiff's professional negligence claim holding

that "the policy disfavoring the total cost approach is based on the lack of proof of

proximate cause."  842 P.2d 148, 155 (Alaska Sup. Ct. 1992).[22]  "Many of [the plaintiff's

---

[22]The Alaska Court had previously held that the total cost approach was
disfavored for contract damages.  <u>Fairbanks North Star Borough v. Kandik Constr., Inc.</u>

expert's] calculations on delays and costs were pure estimates.  His methods looked at the effect of the negligence on the whole project, rather than creating a link between a specific delay and a specific cost."  Id. at 156.  The Court agreed that "the cause remained too speculative to submit the issue of damages arising from professional negligence to a jury."  Id. at 157.

Thus, here, the parties fail to present, and the Court is unaware, of any case law that prohibits the use of the modified total cost method to recover damages in tort cases. Nor is there case law that directly permits recovery on such a theory.  Undisputedly, New Jersey courts have never addressed the issue.  Accordingly, this Court must inquire as to the appropriateness of this damage calculation in this case by analyzing the four elements of the modified total cost analysis.

### Prong One:  Impracticability of Proving Actual Losses Directly

First, the plaintiff must prove that the nature of its losses makes it "highly impracticable to determine the amount of the <u>actual</u> losses with a reasonable degree of accuracy."  Cavalier, 51 Fed. Cl. at 419.  When weighing the first prong, where a plaintiff failed to maintain its records, courts are disinclined to allow a plaintiff to rely on this highly disfavored method of recovery "based on a bed of its own making.  Indeed, on several occasions, this court and its predecessor have refused to apply either the 'total cost' or 'modified total cost' methods where a contractor failed to exercise diligence in preserving its records."  Id. at 419; see, e.g., G.M. Shupe v. United States, 5 Cl. Ct. 662, 676 n. 4 (1984); WRB Corp., 183 Ct. Cl. at 426.  Thus, if a court finds that the plaintiff's

---

& Assoc., 795 P.2d 793, 798-99 (Alaska 1990), vacated in part on reh'g, 823 P.2d 632 (Alaska 1991).

inability to prove actual losses is due to its failure to maintain essential cost records, then the plaintiff fails to show that proof of actual damages was impossible or highly impracticable, Id. at 419-20, and the court will decline to allow the plaintiff to use the modified total cost method of recovery.

### Prong Two: Reasonableness of its Original Bid/Price

The second element requires that the plaintiff prove that its original bid was reasonable.  Servidone, 931 F.2d at 861; Cavalier, 51 Fed. Cl. at 421.  In Servidone, the Federal Circuit wrote that this requirement prevents the plaintiff from "get[ting] the benefit of its own failure to anticipate that level of difficulty that a reasonable contractor should have expected."  Servidone Constr. Corp. v. United States, 19 Cl. Ct. 346, 385-386 (1990), aff'd, 931 F.2d 860 (Fed. Cir. 1991).  "[A] determination of what was a reasonable bid must be made from the bids of others." Id. at 385.

In Youngdale & Sons Const. Co., Inc. v. United States, 27 Fed. Cl. 516, 542-43 (1993), the court looked at the depth and accuracy of the information that the bid preparer has access to and relied upon, its investigation or knowledge of the contract conditions, and the government's bid or expectation for the contract.  In Hardwick Brothers Co., II v. United States, 36 Fed. Cl. 347, 378-80 (1996), the court considered the plaintiff's experience with the type of project at issue, its diligence in carrying out investigations of the contract conditions, and it anticipation of contract conditions, and the government's expectations of contract bids.

### Prong Three: The Reasonableness of its Actual Costs

The third element requires the contractor to show that its actual costs are reasonable.  Servidone, 931 F.2d at 861-62; Cavalier, 51 Fed. Cl. at 423.  While a schedule of verified costs is not proof of damages, it is a starting point.  Cavalier, 51 Fed. Cl. at 423.  Then, the plaintiff must show that the additional costs, even though they were incurred, were not mere overruns that a contractor would have to absorb.  See Id. Rather, the plaintiff must demonstrate, with specificity, that the costs were reasonable in light of the required changes.  See Id.

### Prong Four: Lack of Responsibility for the Additional Costs

Finally, the contractor is required to show that it was not the party responsible for the additional costs.  This follows from the general rule that "[w]here both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party."  William F. Klingensmith, 731 F.2d 805, 809 (Fed. Cir. 1984) (internal quotations and citations omitted).  It follows that the plaintiff must show how much of its costs were solely the result of the defendant's negligence versus its own.  Cavalier, 51 Fed. Cl. at 424.  In Cavalier, the court determined that the plaintiff's failure to retain records led to its inability to distinguish between delays attributable to its own actions and those allegedly attributable to the defendant, 51 Fed. Cl. at 424, and thus, the plaintiff could not demonstrate that its additional costs were due solely to the defendant's actions.

In sum, where the plaintiff cannot demonstrate that it satisfies any of the four preconditions, the court will not permit recovery by using the modified total cost theory.

26

As this method of recovery is largely based on a highly disfavored damage theory, the plaintiff must be able to show that some sort of modified total cost method can appropriately be tailored and is applicable in the plaintiff's case.

### Modified Total Cost Method is Inappropriate Here

DMJM's first motion focuses on Plaintiff's inability to satisfy the first and fourth prongs of the modified total cost method.  Specifically, DMJM argues that AMEC cannot use the modified total cost method here, where it cannot prove that the nature of its losses makes it highly impracticable to determine the amount of the actual losses with a reasonable degree of accuracy because Plaintiff failed to maintain its records.  Further, DMJM contends that Plaintiff's failure to maintain such records prevents AMEC from demonstrating how much of its additional costs were solely the result of the DMJM's negligence versus its own.

In an effort to clarify Plaintiff's convoluted argument, the Court will briefly summarize the main points upfront and then detail why each is unpersuasive below. First, Plaintiff adamantly contends that it does not use a modified total cost method of calculating damages.  However, in the event that this Court finds that AMEC does use a modified total cost theory, then it argues that, as a matter of law, such a recovery theory is not barred in this case.  Specifically, AMEC argues it satisfies prong one because it was highly impracticable to segregate the causes of its damages with any reliability because they were so interrelated.  Yet, at the same time, it argues that it did adequately track actual costs incurred through specific cost codes identified by AMEC and its damage

experts, after the fact, to the best of its ability.[23]  Conversely, Plaintiff argues that it

satisfies prong four of the modified total cost method because it clearly establishes cost

codes and damages that are attributable to DMJM alone.  As discussed below, based on

the record, the Court finds that Plaintiff does use a modified total cost theory to

calculate damages, which is inappropriate in this case.

Plaintiff contends that it did not use a modified total cost theory here because it

selected specific cost codes that were specifically attributable to costs incurred solely

due to DMJM's negligence.  Although, AMEC argues and relies on conclusory affidavits

and reports from its experts that actual cost damage calculations were made as opposed

to a modified total cost method of calculating damages here, the testimony from these

very same witnesses paints a very different picture.  There is conflicting testimony from

Plaintiff's own damage expert, NeSmith, who calculated Plaintiff's damages in this case,

that Plaintiff uses a modified total cost method in this case.  In his affidavit, NeSmith, in

a conclusory manner, wrote that "AMEC's claim is not computed as a total cost claim or

modified total cost claim."  NeSmith Aff. ¶ 12.  However, in October 2007, in <u>AMEC

Civil, LLC v. Commonwealth of Va., et al.</u>, when NeSmith testified about AMEC's

theories on this Project, he stated:

> <u>To some degree, we used total cost in the</u>, for example, <u>Shark River
> project</u>; the reason being that you have multiple impacts, events that
> impacted the schedule of the work that provided for disjoining or lack of
> continuity of the work.  And you <u>end up with a cumulative impact</u>.  And
> trying to look at any of those things independently becomes, if not
> impossible, almost impossible.

---

[23]AMEC argues that it did not need to break down its discrete cost codes any
further because doing so would be overly burdensome and less accurate.  Ralston Aff.
¶ 22.  Moreover, AMEC argues it had no contractual duty to DMJM to track costs, and
thus, the tracking it conducted at the time was sufficient.  <u>Id.</u> ¶ 11.

Zetlin Reply Cert., Ex. A, NeSmith Test., dated Oct. 10, 2007 ("NeSmith Test.") 79:2-10
(emphasis added).  When trying to explain NeSmith's testimony, Plaintiff's counsel even
conceded that AMEC did use the total cost method, but on just a small portion of its
claim.  Moreover, all of the evidence presented within these damage claims appear to be
calculated through a modified total cost method.

DMJM asserts that AMEC could have determined its alleged costs and damages
for each claim, but now contends, after the fact, that it is impossible to determine the
causes of the Project's various increased costs.  AMEC claims it has calculated its
damages based upon actual costs it incurred as a result of damages from Defendant's
negligence that are itemized, segregated, and supported by project documentation.
According to AMEC, it uses actual labor costs and other expenses incurred solely due to
DMJM's negligence.  AMEC asserts that it tracked costs throughout the Project until, at
some point, tracking the lowest level of minutia became overly burdensome. See Ralston
Aff. ¶¶ 17-18; Ralston Test.  AMEC disputes DMJM's statements that it should have
added more cost codes to track the costs incurred as a result of DMJM's negligence,
Ralston Aff. ¶¶ 21-22, or that additional cost codes would have yielded a more accurate
representation of the costs incurred.  Id.  Yet, AMEC contends that it did add some cost
codes "within reason" during construction, including 278012 for "SET DECK PANS SB
ONLY," and 278013 for "SP 7N Edge Beam & 1 Diaphragm" under the direct labor
overtime expenses, because of changes to the work on the Project.  Ralston Aff. ¶¶ 22-
23; NeSmith Expert Report Ex. F.  If AMEC actually tracked the costs attributable to
DMJM's negligence, it would have cured the issues here.  The Court notes that Plaintiff,
through the affidavit of Ralston, states that it did track these costs.  Ralston Aff. ¶¶ 42-

43.  However, as discussed herein, contradictory testimony from this very same witness states that AMEC could not track such costs because the causes were so interrelated. See page 33, infra.  Based on Plaintiff's own arguments and the record before the Court, although AMEC could have in all probability tracked all of the additional costs it incurred, it failed to exercise diligence in creating and maintaining these records,[24] which is fatal to its argument that it was impracticable to track actual costs incurred here.  See Cavalier, 51 Fed. Cl. at 419; G.M. Shupe, 5 Cl. Ct. at 676 n. 4.

Even if Plaintiff did track such additional costs to the best of its ability, Plaintiff fails to show how the cost codes presented here are directly the result of DMJM's purported negligence.  Defendant argues that AMEC, similar to the plaintiff in Huber, has failed to segregate extra costs within the total costs, and proceeds without discrimination, segregation, or explanation as to causation.  Thus, according to DMJM, Plaintiff cannot use the total cost method of calculating damages here because it fails to link any act of purported negligence by DMJM causally to damages sustained by AMEC.

New Jersey law requires that the plaintiff in a negligence action prove that defendant's negligence is the proximate cause of plaintiff's damage.  See Keith v. Truck Stops Corp. of Am., 909 F.2d 743, 745 (3d Cir. 1990) (citing Brown v. Racquet Club of Bricktown, 95 N.J. 280, 471 A.2d 25 (1984)); see also Kolos v. United States, No. 06-4563, 2009 WL 983030, at *2 (D.N.J. Apr. 13, 2009).  Although Plaintiff need not attribute specific damages to specific breaches, it is well settled that the evidence

---

[24]Bryon Breese, a project engineer for AMEC, testified that he would like to say that he did in fact track costs, but as he worked 16-hour days, he did not have five minutes to fill it in.  Zetlin Reply Cert., Ex. M, Bryon Breese Test., dated Dec. 16, 2008, 106:24-107:13.

presented must afford "a basis for estimating damages with some reasonable degree of certainty". Jersey City Redevelopment Agency v. Clean-O-Mat Corp., 289 N.J. Super. 381, 402 (App. Div. 1996) (internal quotations and citations omitted). Specifically, the plaintiff must be able to directly link this particular defendant's acts or omissions with the damages sought on a particular claim to a reasonable degree of certainty. Id.

Plaintiff here, must demonstrate "a clear apportionment of the delay and expenses attributable to [DMJM]" as opposed to the other alleged causes of damages. Weeks Dredging & Contracting, Inc. v. United States, 13 Cl. Ct. 193, 241 (1987) (quoting Klingensmith, 731 F.2d at 809). New Jersey courts have required dismissal of claims for delay damages where the party presented an estimate based on various documents but was "devoid of any itemization of specific expenses" and thus could not link its claimed delays to specific damages and reasonably certain dollar amounts. Jersey City, 289 N.J. Super. at 402. The evidence in the record demonstrates that Plaintiff did not adequately maintain records that track its actual losses solely attributable to DMJM's purported negligence. On the other hand, that does not mean that Plaintiff will be unable to show that its actual losses are attributable to DMJM based upon traditional negligence principles and causation theories.

At oral argument, Plaintiff argued that on a micro-level it has presented only the actual costs incurred and damages suffered due to DMJM's negligence.[25]  However,

---

[25]During oral argument, Plaintiff largely rested its argument on Appeal of Illinois Constructors Corp., 94-1 BCA P 26470, 1993 WL 451238 (Eng. B.C.A. Oct. 29, 1993). Plaintiff asserts that, in that case, the court determined that where a party discretely calculates costs that are attributable to defendant alone, and not generalized overruns on a broad, macro-level, it is not using a typical "total cost" claim. However, in that case, the court explained that the appellant "did not simply subtract the estimated or bid

Plaintiff cannot demonstrate that this is in fact what Plaintiff did.  Plaintiff's attorney

conceded that nowhere in any of its thousands of pages of documents and expert reports

presented to the Court is there an explanation of how these cost codes were selected.

When asked to explain what evidence it had to specifically tie these damages to DMJM's

purported negligence, counsel stated that AMEC's affidavits are sufficient and that, at

trial, AMEC would explain and prove how these cost codes, and thus, AMEC's purported

damages, are linked to DMJM.

       In their affidavits, AMEC's experts, NeSmith and Ralston said that they carefully

considered and determined the cost codes that captured increased and actual costs

AMEC incurred as a result of DMJM's negligence.  NeSmith Aff. ¶¶ 37-38; Ralston Aff.

¶¶ 42-43.  Specifically, Plaintiff states that "[i]n preparing AMEC's claim, AMEC's

management consulted with Ted NeSmith during the span of several months and

identified for Mr. NeSmith the Project cost codes which captured the costs incurred

resulting from delays and disruptions caused by DMJM's negligence."  Ralston Aff. ¶ 42.

Further, "AMEC management was diligent in identifying these codes so that only those

costs which are attributable to DMJM's wrongdoing were included in its damages

claim," Ralston Aff. ¶ 43.  These affidavits, however, are far from sufficient in this case.

Nowhere does Plaintiff explain how these cost codes were selected, or demonstrate that

_____

costs of it and its subcontractors from their actual costs incurred." Id. at 32.  Rather, the
appellant provided a "detailed cost-code-by-cost-code presentation and explanation by
highly credible technical witnesses of the nature of the claimed costs" as well as a
"detailed analysis by well-qualified witnesses of estimates, actual expenditures and
causation." Id.  As discussed herein, the instant case is clearly distinguishable, as AMEC
fails to provide a detailed explanation – although it claims it will do so at trial – of how
cost codes were developed or how such alleged overruns were attributable solely DMJM.

the other causes of damages, such as that stemming from Plaintiff's own negligence, NJDOT, and other sources, were omitted from these selections. Rather, the evidence presented demonstrates that AMEC may not be able to be directly link these causes to DMJM alone. Plaintiff's own witness, Ralston, testified that it was "very, very hard to segregate [the purported increased costs for specific errors due to DMJM's negligence] with any reliability between the different causes" because the causes were "so interrelated." Zetlin Reply Cert., Ex. H, Ralston Test., dated Aug. 28, 2009, 276:23-277:3, 279:8-17.

The Court finds Plaintiff's arguments that it does not use modified total cost theory in this case unpersuasive. Based on all of the representations of the parties and when viewing the record as a whole, the only logical conclusion that may be drawn is that Plaintiff does use a modified total cost method of calculating damages here. Moreover, Plaintiff has not shown that some sort of modified total cost method can appropriately be tailored and is applicable in its case, where it offers generalized assertions combined with a highly scrutinized damage theory, that requires Plaintiff, at a minimum, show that it adequately kept records for which defendant is responsible, particularly in light of the fact that the affidavits of Plaintiff's experts are controverted by these very same witnesses' own testimony. Therefore, the Court finds that the modified total cost theory, is unacceptable to prove Plaintiff's damages here, where Plaintiff fails to show, even by a preponderance of the evidence, that it adequately tracked costs or that its damages are solely the responsibility of DMJM.

AMEC, however, will be afforded the opportunity to present proofs to the jury that it, to a reasonable degree of certainty, suffered actual damages attributable solely to DMJM's negligence.  Indeed, in <u>Huber</u> and <u>Conam Alaska</u>, the proofs were presented at trial and the courts dismissed the plaintiffs' claims for damages prior to submitting them to the jury.  In other words, Plaintiff will have to prove that its cost codes accurately represent costs attributable solely to DMJM's action, as it would in a typical negligence action.  If, however, the Plaintiff is unable to properly present such proofs, the Court will not allow AMEC to submit such damages to the jury.[26]

### B.    CUMULATIVE IMPACT THEORY

AMEC's use of the cumulative impact theory to show causation is riddled with the same concerns that the Court has with AMEC's modified total cost approach to calculate damages, as discussed above.  Similar to the modified total cost method, the parties fail to present, and the Court is unaware, of any case law that holds that the use of the cumulative impact theory to prove causation is appropriate in tort cases.  The parties do not dispute that this theory is also disfavored.  AMEC contends, however, that it does not use a cumulative impact theory here, while DMJM charges that Plaintiff uses this theory to satisfy the causation element in its causation claim.

In the contract area, the cumulative impact theory allows the plaintiff to recover all of its losses from a party with whom it is in privity of contract, if it can show that the

---

[26]Further, the Court envisions that there may be some Daubert issues with respect to AMEC's experts; however, such discussion would be premature here.

disruption resulted solely from the defendant's actions.  See Aetna Cas. & Sur. Co. v.

George Hyman Constr. Co., 1998 U.S. Dist. LEXIS 22627, at *259-60 (E.D. Pa. May 13,

1998)).  When the court, in Aetna Cas. & Sur. Co., discussed a cumulative impact claim,

it wrote:

> The term "cumulative impact" has come to mean in a generic sense, the
> impact on unchanged work which is not attributable to any one change but
> flows from the synergy of the number and scope of changes issued on a
> project.  The underlying theory is that numerous changes cause a
> cascading ripple-type of impact on performance time and efficiency which
> is too uncertain or diffuse to be readily discernible at the time of pricing
> each individual change.

Id. (quoting McMillin Bros. Constructors, Inc., EBCA, No. 328-10-84, 91-1 B.C.A. (CCH)

P23,351 (1990), aff'd, 949 F.2d 403 (Fed. Cir. 1991)).  The plaintiff must prove that the

delay was caused by the defendant and that the delay is compensable.  Id.  A claimant, in

the construction industry, must conduct a scheduling analysis of the project's schedules

and logs based on corroborating evidence, such as vital records that reflect the costs it

incurred relative to each asserted claim, to show that the delays affected activities on the

critical path, which delayed the completion date of the project.  See G.M. Shupe, Inc. v.

United States, 5 Cl. Ct. 662 (1984).  Further, the claimant must show that its originally

planned schedule for completing the work was a feasible and reasonable plan for the

sequence and duration of the work in an effort to show that the delays were not due to

the claimant itself.  See Sterling Millwrights, Inc. v. United States, 26 Cl. Ct. 49, 77

(1992).  In Betchel Nat'l, Inc., 90-1 BCA ¶ 22549, NASA BCA No. 1186-7, 1989 WL

160470 (N.A.S.A.C.A. 1989), the court held that:

> Cumulative impacts need not be traced to specific causes of increased
> performance costs, but can arise from changes which, when viewed
> retrospectively, were so many and had such effect on performance that
> there is a separately compensable impact claim.

Plaintiff cites to several <u>contract</u> cases from the Board of Contract Appeals that permit the recovery of cumulative impact costs.  <u>See, e.g.</u>, <u>Ingalls Shipbuilding Div., Litton Sys., Inc.</u>, 78-1 B.C.A. P 13038, ASBCA No. 17579, 1978 WL 2301 (A.S.B.C.A. 1989); <u>David J. Tierney, Jr., Inc.</u>, 88-2 B.C.A. (CCH) ¶ 20,806, 1988 GSBCA LEXIS 161 (1988).  DMJM also cites to cases in which this theory has been applied, Df. Mot. at 26-27, but Defendant challenges Plaintiff's ability to recover under this theory here because Plaintiff cannot prove that the existence of the delay was proximately caused by Defendant.

In <u>Claims for Construction Productivity Losses</u>, Michael R. Finke writes that a cumulative impact claim is a "total productivity loss" claim because it has a tendency to emphasize liability and damages at the expense of causation.  26 Pub. Cont. L.J. 311, 333 (1997).  In addition to the Finke article, the unreliability of the cumulative impact theory has been emphasized in <u>Bruner & O'Connor Construction Law</u>:

> The "cumulative impact" claim is viewed with circumspection[27] because
> productivity can be affected by numerous impacting events other than

---

[27]Citing Finke, <u>Claims for Construction Productivity Losses</u>, 26 Pub. Cont. L.J. at 337 ("Although disruption (i.e., the loss of productivity) is sometimes categorized as being either local or cumulative, there is no such thing as synergistic, greater-than-the-sum-of-its-parts cumulative disruption.  At least insofar as entitlement is concerned, all disruption is 'local.'  It is more accurate to refer to 'unforeseeable' disruption rather than 'cumulative' disruption.  To use the term 'cumulative' implies that the disruption is somehow causally different from local disruption and that is simply not the case.  In fact, the typical cumulative disruption claim is nothing more than a total productivity loss claim and should be subject to the same prerequisites as total cost claims.")

compensable events. The "cumulative impact" claim, essentially a "total labor cost" claim, requires proof that:

> 1. Impact attributable to changes was unforeseeable or was expressly excluded from change order settlements;
>
> 2. The changes were the sole cause of disruption for which the claim is made;
>
> 3. The "cumulative impact" was excessive and unreasonable in relation to what the contractor might have expected;
>
> 4. Impact costs cannot be segregated; and
>
> 5. Cumulative impact costs can be reasonably proven as to amount.

5 BOCL § 15:119 (some internal footnotes omitted).

Plaintiff disputes that it relies on this theory and asserts that any portion of its claim that could even be arguably cumulative is not a "cumulative impact claim" because "[i]t is not some vague, greater-than-the-sum-of-its-parts result of a multitude of change orders that transcends causation and arises to the level of a separate claim."  Pl. Opp. at 24.  Rather, Plaintiff contends that its damages are only cumulative in that they were caused by a "ripple effect" that DMJM's negligent design catalyzed.  Id.

Plaintiff cites to Point Productions A.G. v. Sony Music Entertainment, 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002) to demonstrate that the causation element in tort law is similar to the causation requirement in contract law.  In Point Productions, the court found "[t]he causation requirement in contract law is similar to that in tort law. . . . [T]o make out a prima facie negligence case a plaintiff must prove that the defendant's negligent act or omission was both the cause in fact and the proximate cause of the plaintiff's injury."  Point Productions, 215 F. Supp. 2d at 341 (internal citations omitted); McCormack, Handbook on the Law of Damages, § 73, at 261 (1935).  Thus, Plaintiff argues, if the cumulative impact theory has been properly applied in contracts, which

requires that causation be established, then such causation can be established using this method in negligence actions.

To support Defendant's argument that although the cumulative impact theory has been used in contracts, cumulative impacts are by their nature not foreseeable, Defendant cites to the lone case of In re Venetian Lien Litigation, No. A397391, A413638, 2004 WL 3265025, at *1 (Nev. Dist. Ct. Sept. 23, 2004). In that case, the court held that "[c]umulative impact claims are presented when contractors cannot allocate damages to specific breaches and therefore cannot establish actual and proximate cause." In re Venetian Lien Litigation, 2004 WL 3265025, at *1. It is unclear from that unpublished, one page conclusory opinion, decided under Nevada law, whether or not the court was even discussing the application of the cumulative impact theory in tort or contract. See Id. The Court need not reach as far as Defendant would like, to find that the cumulative impact theory can never be used in tort actions, because Plaintiff fails to show that the theory is appropriate when applying the facts of this case.

As discussed in the analysis of the total cost method, there are substantial questions regarding Plaintiff's ability to show causation, i.e. linking DMJM's alleged acts of negligence, filtered down through a ripple effect, to all damages AMEC allegedly suffered. See Part III.A., supra. On the other hand, Plaintiff's assertions that it will prove causation at trial, based upon representations that its experts will fully explain their analyses and adequately link AMEC's damages to DMJM's actions, will survive this motion, because the Court cannot find, at this juncture, that under no circumstances

38

will Plaintiff be able to prove that any of its requested damages with respect to these claims are attributable to DMJM alone.[28]

### C.   SPECIAL DAMAGES FOR ATTORNEY'S FEES, COSTS & EXPENSES

Plaintiff seeks to recover $4,685,793 in attorneys' and experts' fees, costs, and expenses ("Fee Claim") as special damages resulting from Plaintiff's pending state action against NJDOT ("State Action")[29] arising from, at least in part, the alleged tortious conduct of DMJM.  See Pl. Opp. at 1.  Defendant argues no fee-shifting statute and no-fee shifting agreement authorize this claim, nor is there any other legal basis for it.  Because, as DMJM argues, the question of whether AMEC may be entitled to recover on its Fee Claim is purely a question of law, it is ripe on this motion.

As a preliminary matter, the Court dismisses Defendant's argument that AMEC cannot recover its Fee Claim here because it failed and refused to name DMJM as a defendant in the State Action, despite DMJM's expressed amenability to such an inclusion.  Df. Mot. at 9.  Even if Plaintiff had brought its claims against DMJM in the State Action – in the same case as it sued the third-party, NJDOT – AMEC would have

---

[28]The Court warns AMEC that to the extent that it attempts to attribute its own negligence and the other causes to DMJM through a cumulative impact theory, it will not be permitted.  For example, the Court will not accept a "ripple effect" argument by AMEC that it was forced to work in a different season due to DMJM's design errors, and thus, DMJM should be liable for, arguendo, AMEC's own negligence or the other causes of damage under these conditions.  Indeed, the Court will not accept the contention that since DMJM's errors and omissions were riddled throughout the Project, DMJM is liable for every excess cost incurred throughout the Project.

[29]Plaintiff has yet to prevail in the State Action, and on December 16, 2008, a number of Plaintiff's claims were dismissed and reconsideration was subsequently denied.

been able to make the same request and argument for the special damages that it seeks against DMJM here.  Lovett v. Estate of Lovett, 250 N.J. Super. 79, 94 (Ch. Div. 1991) (finding that even where the direct claims and third-party claims are rolled into one action, the fees are "severable" and "the fees incurred in the third-party aspects of the case are recoverable as damages").  To recover, however, AMEC would have to segregate the fees, since only the fees incurred for the required third-party action could even arguably be recovered.  Jugan v. Friedman, 275 N.J. Super. 556 (App. Div. 1994).  Thus, the Court must inquire as to the appropriateness of AMEC's Fee Claim in the instant case.

Defendant argues that AMEC's Fee Claim is precluded by New Jersey law.  The parties do not dispute that there is no contractual basis for AMEC's claims, as the parties did not have a contract or a fee-shifting agreement.  The parties do not dispute that New Jersey generally adopts the American Rule,[30] in which a prevailing litigant is typically prohibited from recovering attorney's fees from the losing party.  See Alyeska Pipeline Serv. Co. v. Wilderness Society, 421 U.S. 240, 247 (1975).  Plaintiff, however, argues that certain claims for attorneys' fees, which are incurred in suits against third parties necessitated by a tortfeasor are not subject to the American Rule,[31] as written in Section 914 of the Restatement (Second) of Torts:

---

[30]New Jersey's main exception to the American Rule has been codified in New Jersey Court Rule 4:42-9(a), which provides that a court may award counsel fees only in specific instances where such an award is permitted by statute by the Civil Practice Rules.  This Rule does not contain a provision for recovering legal fees in a negligence action.

[31]Regardless of whether this Court were to interpret Section 914 of the Restatement to fall outside of the scope of Rule 4:42-9(a) or as an additional exception, Plaintiff concedes that the result would be the same here.  See Pl. Opp. at 5.

(1) The damages in a tort action do not ordinarily include compensation for attorney fees or other expenses of the litigation.

(2) <u>One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person</u> is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

<u>Restatement (Second) of Torts</u> § 914.  "Despite New Jersey's general adherence to the American Rule that parties should bear their own attorney's fees unless fee shifting is authorized by statute, court rule or contract, the State's courts have long recognized the principle, reflected in § 914 of the Restatement, that one whose tortious conduct <u>requires</u> another to bring or defend a suit against a third-party to protect his interests may be assessed the attorneys' fees incurred in the third-party action as an element of damages arising from the tort."  <u>DiMisa v. Acquaviva</u>, 400 N.J.Super. 307, 314, 947 A.2d 168, 172 (App. Div. 2008) (citing cases) (emphasis added).

To determine whether a party is "required" to bring an action to protect its interests as a result of the tort of another, courts look to whether the litigation was a "'natural and necessary' consequence of the defendant's wrongdoing.  Remote, uncertain and contingent consequences do not afford a basis for recovery."  <u>Lovett v. Estate of Lovett</u>, 250 N.J. Super. 79, 94 (Ch. Div. 1991); <u>see</u> <u>Flowers v. Viking Yacht Co.</u>, 366 N.J. Super 49, 58 (2003).  A quick synopsis of the prevailing New Jersey case law demonstrates why AMEC cannot recover on its Fee Claim in this case.

In <u>Jugan</u>, the court found that the plaintiff could recover legal expenses incurred as a proximate cause of another's tort.  275 N.J.Super. at 572.  In <u>Jugan</u>, the plaintiff

successfully sued defendant and was awarded a judgment with punitive damages. The defendant-debtor then tortiously subverted the plaintiff's efforts to collect on the judgment by disguising his control over certain investment securities. In a second action, the plaintiff sued the recipients of the fraudulent conveyances to collect on the prior judgment. In that latter action the court found that the defendant-debtor's tortious conduct was the proximate cause of the plaintiff's attorney's fees incurred and awarded fees. Id.

In Flowers, the plaintiff, who pleaded guilty in an earlier action to illegal conduct stemming from operating a boat, sued the boat manufacturer for negligent design. The plaintiff alleged that the boat was built in a manner that caused visibility problems, which he argued led to the accident for which he was criminally charged. In that case, the plaintiff sought legal fees from the prior criminal proceeding as special damages. The court found that the non-proximate consequences of a third-party's alleged tort involving allegedly defective design cannot form the basis for legal expenses under Section 914 because the damages must be a "natural and necessary consequence of the [defendant's] alleged wrongdoing." 366 N.J.Super at 57-58.

In Morganroth & Morganroth v. Norris, McLaughlin, & Marcus, P.C., 331 F.3d 406, 416-417 (3d Cir. 2003), the Third Circuit determined that where the plaintiff alleged that the defendant's conduct was both the "but for" cause and the proximate cause of its additional attorney's fees, plaintiff adequately stated a claim for damages under New Jersey law.

The Court here must look to whether the allegedly tortious conduct was the proximate cause of the plaintiff's attorney's fees incurred in the State Action.  In this case, however, Plaintiff fails to even make such an allegation.  Rather, AMEC vaguely alleges that its damages arise from DMJM's tortious conduct.  Defendant argues, and the Court agrees, that AMEC cannot establish that the State Action was in any way required to be brought in order to redress the purported design negligence of DMJM; rather, DMJM argues that AMEC strategically chose to sue NJDOT in contract and the State Action is predicated only in part on DMJM's negligence.

DMJM argues that if AMEC believed that the design of the Project was the source of its losses, it could have sued AMEC much earlier (and without accumulating substantial legal and expert fees by suing NJDOT).  Df. Reply at 2.  Further, DMJM contends that when AMEC strategically choose to sue NJDOT in a contract action, and then to pursue a professional malpractice claim against DMJM for essentially the same damages, using the same attorneys and most of the same experts articulating many of the same arguments, it was certainly not "required" to do so.  See Flowers, 366 N.J.Super at 57-58; Lovett, 250 N.J.Super. at 84.

DMJM notes that AMEC was well aware of the design issues involved in the Project long before this federal action, which is evident from AMEC's many pleadings in the State Action.  AMEC filed several versions of its complaint in State court, and as early as its second complaint, Ex. B, AMEC mentioned DMJM and alleged that the delays were at least in part caused by design defects.  Plaintiff's most recent complaint, Ex. F, encompasses the earlier pleadings.

43

Here, DMJM's alleged design negligence constitutes only a portion of the gravamen of AMEC's claims against NJDOT, and thus, Plaintiff is not entitled to attorney's fees and costs in this litigation as a matter of law.  In its complaint in state court, AMEC sued NJDOT for breach of contract, alleging a dozen factors.  Only one of those even mentions DMJM's purported deficiencies due to the Project design, and it is listed in seventh place.  DMJM's Mot., Ex. F, ¶ 281.  Thus, AMEC's State Action cannot be said to be the "natural and necessary consequence" of DMJM's alleged wrongdoing as required to seek special damages in tort.  See Lovett, 250 N.J.Super. 79, 84.  Accordingly, the Court grants Defendant's motion for summary judgment dismissing Plaintiff's claim for fees and costs.


IV.   **CONCLUSION**

For the foregoing reasons, the Court grants Defendant's motion to limit damages in part and denies it in part.  Specifically, the Court finds that Plaintiff may not use the cumulative impact theory of causation or modified total cost method to prove its damages in this case.  Indeed, AMEC will have to show which of its specific damages, proven to a reasonable degree of certainty, are causally related to DMJM's alleged negligence.  Further, the Court grants Defendant's motion for summary judgment, dismissing Plaintiff's claim for costs and fees incurred in the State Action.

/s/   Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

Dated:   June 30, 2009